EASSA PROPERTIES, a Florida
General Partnership,
Plaintiff–Appellant,

v.

SHEARSON LEHMAN BROTHERS,
INC., Michael W. Swofford and
Terry W. Bishop, Defendants–Appellees.

No. 87–8582.

United States Court of Appeals,
Eleventh Circuit.

Aug. 8, 1988.

---

[*] Senior U.S. Circuit Judge Albert J. Henderson has elected to participate in further proceedings in this matter pursuant to 28 U.S.C. 46(c).

Charles E. Campbell, Hicks, Maloof & Campbell, Peter J. Quist, Atlanta, Ga., for plaintiff-appellant.

Peter J. Anderson, Peterson Young Self & Asselin, Louise Bailey Matte, Joel L. Larkin, Atlanta, Ga., for defendants-appellees.

Before KRAVITCH, Circuit Judge, HENDERSON [*] and HENLEY [**], Senior Circuit Judges.

HENDERSON, Senior Circuit Judge:

Eassa Properties ("Eassa"), a Florida general partnership, appeals from an order entered by the United States District Court for the Northern District of Georgia granting the motion of Shearson Lehman Brothers, Inc. ("Shearson") and Terry W. Bishop to compel arbitration of several of Eassa's claims in this securities fraud action. We affirm.

Eassa is composed of four partners who are brothers. Alexander A. "Sandy" Simon, Jr., one of the partners, is the only brother to play a significant role in this case. Shearson is a Delaware corporation with its principal place of business in New York. During the relevant time period, Michael W. Swofford [1] was a broker at Shearson. Bishop, a commodities specialist, assisted Swofford in trading for his commodity accounts at Shearson.

In 1982, Simon, who holds a master's degree from the Wharton School of Business of the University of Pennsylvania, was hired by Burton L. Reynolds, a well known actor and director, to handle his financial affairs. In order to facilitate this purpose, Simon held Reynolds's power-of-attorney. In mid–1983, Simon opened separate security accounts for himself and for Reynolds with Swofford at Shearson's Little Rock, Arkansas office. In doing so, Simon and Reynolds signed Customer's Agreements. In August, 1984, Simon opened separate commodity accounts for himself and for Reynolds with Swofford. Simon signed a Commodity Customer Agreement for his own account. Simon, as Reynolds's attorney-in-fact, executed a new Customer's Agreement for Reynolds's security account and a Commodity Customer Agreement for Reynolds's commodity account. In that same month, Simon also opened a security account and a commodity account with Swofford on behalf of Eassa. [2]

On October 9, 1984, Swofford forged Simon's name to a purported letter of authorization, permitting the withdrawal of $700,000.00 from Reynolds's account. When confronted, Swofford eventually admitted that he had forged the signature on the letter. A subsequent investigation revealed that Swofford had stolen hundreds

---

[*] See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1.] Swofford was originally named as a defendant but failed to answer the complaint. A default judgment was entered against him. He is not a party to this appeal.

[2.] Eassa sent Shearson $549,709.20 in August, 1984 and an additional $99,167.36 in September, 1984.

of thousands of dollars from Reynolds which he used to purchase a house, two expensive automobiles, a boat and other items of personal property.[3] It was also discovered that Swofford and Bishop apparently had transferred large sums of money without authorization from Eassa's security account to its commodity account and had begun to engage in high volume discretionary trading of commodities in excess of the account limitations placed on Shearson by Eassa.

On October 4, 1984, Simon, having been told by Swofford that the Eassa accounts had generated substantial profits, elected to cease trading in Eassa's accounts and to collect its profits. Simon received a check for $100,000.00 payable to Eassa on October 5, 1984 but never recouped the balance of the money he claims is owed to Eassa.

On November 22, 1985, Eassa filed a complaint in the United States District Court for the Northern District of Georgia seeking monetary damages based on different theories, including the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968; section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. U.S.C. § 78j; Rule 10b–5 promulgated thereunder; section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2); and various state securities and common law causes of action. On January 7, 1986, Shearson and Bishop filed a motion to compel arbitration of all of Eassa's claims except the count alleging a violation of § 12(2). *See* 15 U.S.C. § 77n; *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). The district court conducted a hearing on the motion on March 23 and 24, 1987 and granted the motion in an order dated June 17, 1987. This appeal followed.

At the district court hearing, Shearson produced three documents that purport to bind Eassa to arbitrate its claims against Shearson. These documents are a Customer's Agreement, a Commodity Customer Agreement and a Commodity Option Agreement (hereinafter referred to collectively as the "Agreements").[4] The first two documents contain arbitration clauses while the third document incorporates by reference the arbitration provision in the second document.

On the Customer's Agreement, Simon's signature appears twice. The typewritten name "EASSA PROPERTIES" is displayed above each signature and "by: Alexander A. Simon, Jr. 8–24–84" is typed below each signature. On the Commodity Customer Agreement, Simon's signature appears five times. The typewritten name "EASSA PROPERTIES, by: A.A. Simon, Jr." appears beneath each signature. On the Commodity Option Agreement, "EASSA Properties, by A.A. Simon, Jr." is typed below Simon's signature. Eassa contends that the signatures on these documents are forgeries, but that even if they are genuine, Simon did not intend, nor did he have the authority, to bind Eassa to arbitration.

Simon did not deny that the signatures on the Agreements were in fact his signatures. He merely stated that he could not positively identify them. James A. Kelly, a forensics document examiner with the Georgia Bureau of Investigation, testified that he believed that the signature on only the Commodity Customer Agreement was "probably" a forgery. The district court examined the Agreements, compared the signatures on those documents with Swofford's forged signature and with signatures that Simon admitted were genuine, and concluded that Simon had signed all three Agreements. This finding of fact is not clearly erroneous. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985) (a finding of fact will not be reversed as being clearly erroneous unless "the reviewing court on the entire evidence

---

**3.** In 1985, Swofford pled guilty to two counts of wire fraud and conspiracy in the United States District Court for the Eastern District of Arkansas and was subsequently incarcerated in prison.

**4.** Shearson maintains that a fourth document, a Shearson Security Account Limited Discretionary Authorization, mandates the same result. The district court made no finding as to the authenticity of the signature on this document. Therefore, we do not rely on this document in reaching our result.

is left with the definite and firm conviction that a mistake has been committed.").

Despite some evidence to the contrary, the district court accepted Simon's testimony that the Agreements contained no handwritten or typed information when he received them, with the exception of an "X" adjacent to the signature lines. Although it is undisputed that an agent of Shearson typed Eassa's name and account number on the front of the Agreements, the parties disagree about who typed the "Eassa" designation next to Simon's signatures. Simon contends that Shearson's agent typed the designation while Shearson claims that Simon's secretary, Wanda Machek, typed in the name. Although the district court stated that it was "unlikely" that Shearson completed the forms, the court did not make a finding on this issue. The court held that even if Shearson completed the Agreements, Eassa is bound by the arbitration provisions because "Simon intended to sign the documents on behalf of EASSA [and] ... authorized Shearson to complete the documents on behalf of EASSA."[5] Eassa argues that the district court's findings on the questions of intent and authorization are clearly erroneous.

The district court rejected Simon's testimony that, at the time he signed the Agreements, he "probably" though that they were for his personal account. The court's finding that Simon intended to bind Eassa when he signed the Agreements is not clearly erroneous in light of the fact that Simon admitted that he had previously executed identical documents for both his and Reynolds's accounts and the fact that he admitted that he intended to open a security and a commodity account for Eassa and had assumed that Shearson would send him the appropriate documentation to accomplish that purpose. The district court's finding that Simon impliedly authorized Shearson to complete the Agreements on Eassa's behalf also is not clearly erroneous in view of Simon's admission that he had discussed opening accounts for Eassa with Swofford and that, on prior occasions in connection with his and Reynolds's accounts, he had signed blank documents sent to him by Swofford, relying on Swofford to complete them later.

■ Even if Simon signed the Agreements, Eassa contends that he lacked the authority to bind the partnership. The district court concluded that Simon had implied authority to execute the Agreements on behalf of Eassa,[6] finding that his authority to sign the Agreements was "incidental" to his express authority to select and purchase bonds and to trade commodities on margin on Eassa's behalf. Because of the express authority given to Simon by the other partners and because of Simon's conflicting testimony regarding his understanding of the scope of his implied authority, we cannot say that this finding is clearly erroneous.

Eassa also maintains that, under section 9 of the Uniform Partnership Act ("UPA"),[7] there was no valid arbitration

---

5. In addition to these factual findings, the district court, in dictum, held that Georgia law applied to this case and that under Georgia law, a party delivering a document containing blank spaces impliedly authorizes the party receiving the document to complete it. Hence, the district court held that, as a matter of law, Simon bore the risk that Shearson would complete the documents on behalf of Eassa. Eassa asserts that, under Georgia law, this general rule does not apply when the party receiving the document completes it in such a way as to bind a nonsignatory. Because of these factual findings, we need not, and do not, resolve the district court's choice of Georgia law or its application to this case.

6. The district court also found, in dictum, that even if he lacked actual authority to execute the

Agreements, Simon had apparent authority to do so. We need not, and do not, reach the issue of whether this finding is clearly erroneous.

7. Shearson claims that the UPA is preempted by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* However, as the Supreme Court recently reiterated, " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *AT & T Technologies, Inc. v. Communication Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648, 655 (1986) (quoting *Steel Workers v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). While federal law may govern the interpretation and enforcement of a valid arbitration agreement, state law governs

agreement in existance. Section 9 of the UPA provides:

(1) Every partner is an agent of the partnership for the purpose of its business. The act of every partner, including the execution of the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member, binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no authority.

(2) An act of a partner that is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.

(3) Unless authorized by the other partners or unless they have abandoned the business, one or more, but less than all, of the partners have no authority to:

. . . .

(e) Submit a partnership claim or liability to arbitration or reference.

(4) No act of a partner in contravention of a restriction on authority shall bind the partnership to persons having knowledge of the restriction.

Fla.Stat.Ann. § 620.60.[8]

Under the general rule established in section 620.60(1), a partner's actions in furtherance of the business of the partnership bind the partnership. Eassa insists that arbitration agreements mentioned in section 620.60(3)(e) constitute a specific exception to this general rule. However, this exception only exists in the absence of authorization from the remaining partners. In this case, the district court found that Simon had been vested with actual authori-

ty by the remaining partners to bind the partnership to the arbitration agreements. Nothing in the UPA mandates that such authorization must be express rather than implied.

Accordingly, the judgment of the district court is

AFFIRMED.

the question of whether such an agreement exists in the first instance.

8. Application of Georgia's conflicts principles could arguably lead to the application of Florida law (Eassa is a Florida partnership and the Agreements were executed in Florida), Arkansas law (the Agreements were delivered to Arkansas), New York law (the choice of law provision in the Agreements) or Georgia law. This analysis is unnecessary, however, because the UPA, as adopted in all four states, provides that it is to be "interpreted and construed so as to effect its general purpose to make uniform the law of those states which enact it." O.C.G.A. § 14–8–4(d) (1986 Supp.); New York Partnership Law § 4(4) (McKinney 1948); Ark.Stat. § 65–104(4) (1980); Fla.Stat.Ann. § 620.575(3) (1974). Furthermore, as noted by the district court, the statutes contain virtually identical provisions concerning the authority of one partner to bind the partnership to arbitration.