**SECURITIES INDUSTRY ASSOCIATION, Dean Witter Reynolds, Inc., Donaldson, Lufkin & Jenrette Securities Corporation, Drexel Burnham Lambert, Incorporated, Fidelity Brokerage Services Inc., Kidder Peabody & Co., Incorporated, Merrill Lynch, Pierce, Fenner & Smith, Inc., Painewebber Incorporated, Prudential–Bache Securities Inc., Shearson Lehman Hutton Inc., and Smith Barney, Harris Upham & Co., Incorporated, Plaintiffs,**

v.

**Michael J. CONNOLLY, Secretary of State, and Barry C. Guthary, Director, Massachusetts Securities Division, Defendants.**

Civ. A. No. 88–2153–WD.

United States District Court,
D. Massachusetts.

Dec. 19, 1988.

## MEMORANDUM AND ORDER FOR JUDGMENT

WOODLOCK, District Judge.

The Commonwealth of Massachusetts, acting under its Blue Sky law authority over brokers and dealers in securities, has issued prospective regulations seeking to control the circumstances under which a broker may require a non-institutional customer located in Massachusetts to agree to arbitration of disputes between them.

The plaintiffs—the trade association for securities dealers and ten brokerage firms registered to do business as securities broker-dealers in Massachusetts—challenge these regulations on federal constitutional grounds, contending they are preempted by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* The Act requires that in matters affecting the validity, revocability, and enforceability of arbitration agreements, those agreements must be treated no differently than other contracts.

Without adopting any view on the advisability of such provisions, I find that the Massachusetts Blue Sky authorities are without power to enforce them. The Massachusetts securities arbitration regulations are not merely state law supplementation concerning matters collateral to the validity and enforceability of arbitration agreements. Rather, they go to the heart of the process of forming contracts to arbitrate. In doing so, they single out arbitration agreements for more demanding standards than are imposed by the general law of contracts in Massachusetts. Consequently, I will grant the plaintiffs' motion for summary judgment and declare the Massachusetts securities arbitration regulations preempted by the Federal Arbitration Act.

I

Gerald Rath, Steven Hansen, Bingham, Dana & Gould, Boston, Mass., for plaintiffs.

Thomas A. Barnico, Richard M. Brunell, and James Shannon, Atty. Gen., Boston, Mass., for defendants.

In the wake of *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), in which the Supreme Court upheld the use of pre-dispute arbitration clauses to govern resolution of controversies between brokers and their customers,[1] officials of the Com-

---

**1.** Strictly speaking, *McMahon* addressed arbitration of statutory securities law claims only un-

der § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and did not expressly

monwealth of Massachusetts moved quickly to crest the tide of proposals to control the circumstances in which such arbitration could be used. While the North American Securities Administrators Association was calling for reform,[2] while the United States Securities and Exchange Commission was seeking further study and encouraging rule making by the broker/dealer self-regulatory organizations,[3] while the United States Congress was failing to enact proposed legislation regarding securities dispute arbitration,[4] the defendant Secretary of State of the Commonwealth of Massachusetts, through the defendant Director of the Massachusetts Securities Division, was taking definitive action.

The defendants' action came on September 21, 1988, in the form of a singular Massachusetts regulatory definition of "dishonest or unethical practices in the securities business" by broker-dealers. See Mass.Regs.Code tit. 950, § 12.204-(a)(2)(G)1.a.–c.[5]

overrule Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), which had held that a predispute agreement could not be enforced to compel arbitration under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2). The expansive preemptive scope accorded the Federal Arbitration Act in McMahon, however, has placed the continued vitality of Wilko in doubt. A split has appeared in the Circuits on the question. Compare Rodriguez De Quijas v. Shearson/Lehman Bros., Inc., 845 F.2d 1296 (5th Cir.1988) (McMahon effectively overruled Wilko), cert. granted, — U.S. —, 109 S.Ct. 389, 102 L.Ed.2d 379 (1988) with Chang v. Lin, 824 F.2d 219 (2d Cir.1987) (Wilko remains good law in absence of express overruling by the Supreme Court). Presumably the Supreme Court's grant of the petition for certiorari in Rodriguez will resolve this question.

2. NASAA, in a Briefing Paper entitled "Oversight of Securities Arbitration" (June 1988), reported that it had "unveiled in early June a detailed proposal for reform of securities arbitration." Id. at 6. NASAA also announced that it "is exploring the possibility of developing model language for state laws or rules to govern mandatory arbitration clauses in written customer agreements." Id. In October 1988, after this litigation was commenced, NASAA adopted a "Resolution Concerning the Execution of Compulsory Pre-Dispute Arbitration Agreements as a Condition Precedent to Obtaining Brokerage Services," in which it expressed "support [for] the goals and policies of the Massachusetts rules as being consistent with NASAA's purpose of advancing the principle of investor protection and affording choice to investors in their decisions to participate in the securities markets." Second Affidavit of Barry C. Guthary, Exhibit A.

3. In letters dated July 8, 1988, SEC Chairman David S. Ruder requested that all the self-regulatory organizations in the brokerage industry "review the issues raised by the current use of mandatory predispute arbitration agreements" and "report back to the Commission by October 15, 1988." Statement of David S. Ruder Before the Subcomm. on Telecommunications and Finance of the House Comm. on Energy and Commerce Concerning the Securities Arbitration Process and the Voluntariness of Agreements to Arbitrate Broker–Dealer/Investor Disputes, July 12, 1988 [hereinafter Ruder Statement], Attachment 3. The proposals of the self-regulatory organizations have apparently been received and are under consideration by the Commission. See Wurczinger, SEC Faces Mandatory Arbitration Issue, Nat'l L.J., Nov. 14, 1988, at 21, col. 1.

4. Legislation introduced by Congressmen Boucher, Dingell, and Markey, H.R. 4960, 100th Cong., 2d Sess. (June 30, 1988), see generally 134 Cong.Rec. E 2233 (remarks of Cong. Boucher); E 2239–41 (remarks of Cong. Dingell); E 2245–46 (remarks of Cong. Markey) (daily ed. June 30, 1988), died in Committee during the last Congress. 2 Congressional Index (CCH) at 35,-106 (100th Cong.).

5. The new definition provides as follows:

(G) Dishonest or unethical practices in the securities business.

1. Broker-dealers. Each broker-dealer shall observe high standards of commercial honor and just and equitable principles of trade in the conduct of its business. Act and practices, including but not limited to the following, are considered contrary to such standards and constitute dishonest or unethical practices which are grounds for denial, suspension or revocation of registration or such other action authorized by law:

a. Requiring on or after January 1, 1989, that a customer located in Massachusetts, other than a customer that is an institutional investor or financial institution specified in 950 CMR 14.401(e), execute either a mandatory pre-dispute arbitration contract or a customer agreement containing a mandatory pre-dispute arbitration clause that is a non-negotiable precondition to effecting transactions in securities for the account of the customer or opening a securities cash account or margin account by the customer with such broker-dealer;

b. Requesting on or after January 1, 1989, that a customer located in Massachusetts execute either a mandatory pre-dispute arbitration contract or a customer account agreement containing a pre-dispute arbitration

This regulatory definition forbids broker-dealers licensed in Massachusetts from requiring Massachusetts customers to sign a mandatory pre-dispute arbitration agreement as a non-negotiable condition to opening a brokerage account. The definition also requires broker-dealers to disclose fully the legal effects of arbitration agreements before entering into a negotiated contract with a customer. What constitutes negotiability, and what full disclosure of legal effects would consist of, are left undefined by the definition.

Under the Massachusetts securities arbitration regulations, non-negotiability of, and lack of full disclosure of legal effects regarding, arbitration agreements do not become dishonest or unethical until January 1, 1989.

Proscriptions against such "dishonest or unethical practices" by broker-dealers are enforced by the power of the defendant Secretary of State to deny, suspend, or revoke the registration of a broker or brokerage firm. Mass.Gen.L. ch. 110A, § 204. Because an unregistered broker may not transact business in Massachusetts, *id.* § 201, any broker who wishes to do business in Massachusetts must observe the securities arbitration contract regulations which the definition establishes.

Moreover, if a broker—or for that matter a customer—were to attempt to enforce a contract formed without compliance with the Massachusetts securities arbitration regulations, that attempt would be unavailing. Under Chapter 110A, § 410(f),

[n]o person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any rule or order hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract.

If implemented in January, these proscriptions will have an immediate effect on the contracts used by broker-dealers transacting business with customers located in Massachusetts. The affidavits submitted by the plaintiff brokerage firms indicate some variety in their use of arbitration agreements, but certain elements are common.[6] Mandatory written pre-dispute arbitration agreements in some form are used by all the plaintiffs. And these pre-dispute agreements do not purport to advise customers of the "legal effects" of the arbitration clauses.

Each of the plaintiff brokerage firms uses arbitration agreements in its standard margin and option account contracts, with the exception of Shearson Lehman Hutton Inc., which has no arbitration clause in its option account contract. A bare majority of the plaintiffs, however, do not use arbitration agreements in standard cash accounts for individuals, although one member of that majority, Donaldson Lufkin & Jenrette Securities Corporation, does have an arbitration agreement for corporate customers. In addition, Smith Barney, Harris Upham & Co., which has an arbitration agreement in its standard cash account, avers that

clause where the contract or agreement fails to conspicuously disclose that the execution of the contract or agreement cannot be made a non-negotiable precondition to the opening by the customer of a securities account with the broker-dealer;

   c. Requesting on or after January 1, 1989, that a customer located in Massachusetts execute either a mandatory pre-dispute arbitration contract or a customer account agreement containing a pre-dispute arbitration clause without fully disclosing to the customer in writing the legal effect of the pre-dispute arbitration contract or clause;

   . . . .

**6.** The written brokerage contracts in which these agreements are contained plainly concern

transactions involving interstate and international commerce. For the most part, the purchase and sale of securities is conducted over national exchanges or through traders who are located in New York. The instrumentalities of interstate commerce—telephones and the mails —are used to execute and report brokerage trades. Thus, the agreements at issue here fall within the broad construction, *see Societe Generale de Surveillance, S.A. v. Raytheon European Management and Systems Co.,* 643 F.2d 863, 867 (1st Cir.1981), given the reach of the Federal Arbitration Act, which applies to any "written [arbitration] provision in . . . a contract evidencing a transaction involving Commerce." 9 U.S. C. § 2.

execution of that arbitration agreement is not a requirement for opening a Smith Barney cash account.[7]

The plaintiffs are unanimous in asserting a desire to require certain customers to agree to arbitrate disputes as a condition to opening an account.

The Massachusetts securities arbitration regulations would change this practice by establishing additional disclosure requirements in an as yet undefined format. The Massachusetts securities arbitration regulations would also prevent broker-dealers from implementing the apparently universal practice of requiring at least certain customers to enter into arbitration agreements for their disputes.

## II

■ In confronting a preemption claim, the "sole task" of the court is to determine the intent of Congress. *Massachusetts Medical Soc'y v. Dukakis*, 815 F.2d 790, 791 (1st Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987) (quoting *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987)). The Federal Arbitration Act preempts the Massachusetts broker arbitration regulations "if and only if Congress intended it to do so." *Id.*

The question to be addressed is "whether Congress (expressly) did or (impliedly) meant to displace state law or state law concepts in enacting ... the federal scheme set up by Congress." *Palmer v. Liggett Group, Inc.*, 825 F.2d 620, 625–26 (1st Cir. 1987). In answering that question, the principal consideration is whether state regulation creates a material disturbance in the field of federal concern. "If the state law disturbs too much the congressionally

declared scheme—whether denominated as 'occupying the field' or 'actually conflicting with federal law'—it will be displaced through the force of preemption." *Id.* at 626.

The question whether the Massachusetts broker arbitration regulations at issue here materially disturb the federal arbitration scheme may be answered by reference to the history and the logic of the Arbitration Act.

### –A–

At its enactment in 1925, the Act was intended to "revers[e] centuries of judicial hostility to arbitration agreements." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 510, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974).

In 1953, the courts still harbored reservations about full applicability of the Arbitration Act. The decision that year in *Wilko v. Swan, see supra* note 1, "reflect[ed] a general suspicion of the desirability of arbitration and the competence of arbitral tribunals." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 2340, 96 L.Ed.2d 185 (1987).

In the years after *Wilko*, however, the Supreme Court systematically rejected the reasons supporting *Wilko*'s suspicion of the arbitration process. By 1987, the Supreme Court could observe that "the mistrust of arbitration that formed the basis for the *Wilko* opinion in 1953 is difficult to square with the assessment of arbitration that has prevailed since that time." *Id.,* 107 S.Ct. at 2341.

Recent history has found the Supreme Court offering forceful endorsements of the arbitration process by expansive state-

---

**7.** The plaintiffs' present practice appears to be fairly representative of the brokerage business generally. The Division of Market Regulation of the United States Securities and Exchange Commission in a 1987 study of the 65 firms which account for 90 percent of the brokerage customer trading accounts, *see Ruder Statement, supra* note 3, at 8, found that arbitration agreements were all but universal for margin accounts (89 percent of the firms used such agreements) and for option accounts (83 percent of the firms used such agreements). With

respect to straight cash accounts, however, the percentage of total accounts using arbitration agreements is only about 40 percent. However, 30 percent of the firms surveyed in the SEC study reported that they had under active consideration plans to expand the number of accounts for which an arbitration agreement would be required. *See* SEC, Summary of Staff Findings with Respect to the Use of Predispute Arbitration Clauses, *Ruder Statement,* Attachment 4.

ments of the intent of Congress in passing the Federal Arbitration Act. In the last five years, the Court has variously found in the statute an embodiment of "Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause," *Perry v. Thomas*, 482 U.S. 483, 107 S.Ct. 2520, 2526, 96 L.Ed.2d 426 (1987); an "emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 3356–57, 87 L.Ed.2d 444 (1985); "a national policy favoring arbitration," *Southland Corp v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984); and "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary," *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

That policy has been set loose with hydraulic pressure, sweeping away any state law purporting to "override the parties' choice to arbitrate rather than litigate in court." *New England Energy Inc. v. Keystone Shipping Co.*, 855 F.2d 1, 4 (1st Cir.1988). Of course, "the Federal Arbitration Act has never been construed to preempt all state law on arbitration." *Id.* Nevertheless, as the First Circuit recently observed in *New England Energy*, "the Supreme Court's decisions support a conclusion that all state laws seeking to *limit* the use of the arbitral process are superseded by federal law." *Id.* (emphasis in original).

–B–

As a matter of logic, analysis of whether state regulations affecting the arbitration choice are preempted focuses on whether the state regulations "single out arbitration agreements" for special treatment. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 723 F.2d 155, 158 (1st Cir.1983), *aff'd in part, rev'd in part*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The anti-singularity premise has been articulated with both pedestrian and intestinal metaphors. Because the funda-

mental purpose of the Federal Arbitration Act "was to place an arbitration agreement 'upon the same footing as other contracts, where it belongs'," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985) (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess. 1 (1924)), the courts have been vigilant to ensure that state law concepts specially directed at arbitration contracts are not permitted to "eviscerate" that purpose, even indirectly. *Southland Corp. v. Keating*, 465 U.S. at 16 n. 11, 104 S.Ct. at 861 n. 11; *see, e.g.*, *N & D Fashions, Inc. v. DHJ Indus.*, 548 F.2d 722, 727–28 (8th Cir.1976); *Medical Dev. Corp. v. Industrial Molding Corp.*, 479 F.2d 345, 348 (10th Cir.1973); *Michael v. NAP Consumer Elec. Corp.*, 574 F.Supp. 68, 70 (D.P.R.1983) (Torruella, J.).

The formation of arbitration contracts can be wholly a matter of state law "*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas*, 107 S.Ct. at 2527 n. 9 (emphasis in original). However, "[a] state law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [§ 2 of the Federal Arbitration Act]." *Id.* As a consequence, "§ 2 of the Act preempts state statutory and case law that treats arbitration agreements differently from any other contract." *Cook Chocolate Co. v. Salomon, Inc.*, 684 F.Supp. 1177, 1182 (S.D.N.Y.1988).

The metaphor of "equal footing" is expressly embodied in § 2, which provides that written agreements "to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any* contract." (emphasis supplied). The inherent logic of § 2 was succinctly summarized by Judge Weinfeld in *Avila Group, Inc. v. Norma J. of Cal.*, 426 F.Supp. 537, 541 (S.D.N.Y.1983): "Courts applying federal law under the Arbitration Act have rejected cases that purport to apply special rules and requirements to agreements to arbitrate that are

not applicable to other contracts" (footnote omitted).

## III

■ The defendants concede that the regulations single out arbitration agreements: "It is true," defendants note in their Memorandum of Law on Summary Judgment, "that the regulations themselves apply only to arbitration agreements." *Id.* at 46. In this sense, the defendants recognize that the securities arbitration regulations are the paradigm of "[a state law principle that takes its] meaning precisely from the fact that a contract to arbitrate is at issue." *Id.* at 46–47 (quoting *Perry v. Thomas,* 107 S.Ct. at 2527 n. 9).

The defendants justify the regulations, however, by an appeal to another purpose evident in the legislative history of, and case law construing, the Federal Arbitration Act: the concern to implement voluntary agreements to arbitrate.[8] Alternatively, they rely upon the overall pattern of securities broker regulations, which they contend has effectively modified the Arbitration Act so as to permit their regulations.

–A–

The defendants' appeal to the voluntariness concern of the Federal Arbitration Act is a semantic sleight of hand. There is no question that the Federal Arbitration Act was designed to give full force to the agreement of the parties—a presumptively voluntary undertaking. But, as used by the defendants, the concept of voluntariness addresses the fundamental principles of contract formation upon which questions of validity, revocability, and enforceability of arbitration agreements turn. As used in that way, the concept of voluntariness is not a matter subject to idiosyncratic rules or definitions. Massachusetts is not free under the Federal Arbitration Act to develop a definition of voluntariness applicable only to the negotiation of arbitration agreements and not to other contracts generally.[9]

That, of course, is precisely what the defendants' purported voluntariness enhancements do. There is no general contractual duty in Massachusetts requiring one party to describe fully—or for that matter, at all—the legal effect of a contractual provision to another party with whom the first party proposes to contract.[10] Nor

---

**8.** The Supreme Court has characterized "[t]he preeminent concern of Congress in passing the Act [as] enforce[ment of] private agreements into which parties ha[ve] entered." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985).

**9.** Federal courts have refused to apply similar state voluntariness enhancements specially directed toward arbitration agreements. The Eighth Circuit in *Collins Radio Co. v. Ex-Cell-O Corp.,* 467 F.2d 995 (8th Cir.1972), declined on preemption grounds to enforce a Texas law which allegedly required the advice and signature of a Texas attorney for each party to the arbitration agreement. In *Webb v. R. Rowland & Co.,* 800 F.2d 803 (8th Cir.1986), that court declined on preemption grounds to apply a choice of law provision in an arbitration agreement which would have invalidated the agreement for failure to provide a statutorily required special ten-point capital letter notice regarding the binding character of the arbitration provision and would possibly have rendered unenforceable as a contract of adhesion the preprinted arbitration form contract. And in *Wydel Associates v. Thermasol, Ltd.,* 452 F.Supp. 739 (W.D.Tex.1978), Chief Judge Spears of the Western District of Texas refused to apply a provision of Texas' version of the Uniform Part-

nership Act to invalidate an arbitration agreement signed by only one of the partners.

The two cases cited by defendants as examples of singular state treatment of arbitration contract formation countenanced by the federal courts are, respectively, inapposite and nonpersuasive. In *Hull v. Norcom, Inc.,* 750 F.2d 1547 (11th Cir.1985), the court understood itself to be applying "the general provisions of state contract law to the determination of 'the making of [the] arbitration agreement'." *Id.* at 1551 (quoting 9 U.S.C. § 4). *Eassa Properties v. Shearson Lehman Bros. Inc.,* 851 F.2d 1301 (11th Cir. 1988), disposed of the issue by a brief footnote offering dicta. Finding that a single partner "had been vested with actual authority by the remaining partners to bind the partnership to the arbitration agreements," *id.* at 1305, the court had no occasion to consider the effect of *Perry* and *Wydel* on its general observation that "state law governs the question of whether [an arbitration] agreement exists in the first instance," *id.* at 1304 n. 7.

**10.** Indeed, as the Ninth Circuit noted recently:

We know of no case holding that parties dealing at arm's length have a duty to explain to each other the terms of a written contract.

is there any general restriction requiring specific provisions to be "negotiable." [11]

Thus there can be no question that the new arbitration provisions represent a radical departure from the treatment of contracts generally in the State's common law. To be sure, Massachusetts law does contain a variety of idiosyncratic statutory provisions which require special treatment of—and disclosure regarding—certain types of contractual provisions. But the short and sufficient answer to this point is that these provisions—whether styled voluntariness enhancements or not—are the exceptions which prove the rule. For example, when Massachusetts wanted to require certain disclosures in the consumer credit context, a special truth-in-lending law, Mass.Gen.L. ch. 140D, was necessary, because the Act represented a significant departure from the law which affects contracts generally in Massachusetts.[12] And, of course, neither the Massachusetts truth-in-lending provisions, nor any of the other exceptions cited by the defendants as authority, purports to single out arbitration agreements.

The Massachusetts securities arbitration regulations are not concerned with "mat-

ters collateral to the agreement to arbitrate," such as the procedural issues relating to consolidation of arbitration proceedings dealt with by the First Circuit in *New England Energy Inc. v. Keystone Shipping Co.*, 855 F.2d 1, 4 n. 2 (1st Cir.1988). Rather, the defendants' regulations govern the validity and enforceability of arbitration agreements themselves by establishing standards which, if not met, render the arbitration agreements unenforceable and the unsuccessful makers of those agreements subject to sanction. It is difficult to imagine regulation more central to the arbitral decision.

The defendants' regulations assume this central position by establishing hurdles to the formation and execution of securities arbitration agreements that are not found in the general contract law of Massachusetts. Because the voluntariness concerns expressed in the unique Massachusetts securities arbitration regulations impose conditions on the formation and execution of arbitration agreements which are not part of the generally applicable contract law of Massachusetts, they cannot be given effect under the Federal Arbitration Act.

---

We decline to impose such an obligation where the language of the contract clearly and explicitly provides for arbitration of disputes arising out of the contractual relationship.

*Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 287 (9th Cir.1988); *cf. Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 806 F.2d 291, 295 n. 6 (1st Cir.1986) ("Despite ... statement by the *Wilko* Court that *certain* investors may operate at a disadvantage *vis a vis* their more sophisticated brokers, we do not believe that it requires the invalidation of *all* customer-broker arbitration agreements *ab initio*") (emphasis in original).

**11.** Massachusetts follows the Restatement position that contracts of adhesion are not unenforceable unless they are unconscionable. *See Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 291–95 & 292 n. 12, 408 N.E.2d 1370 (1980); Restatement (Second) of Contracts § 208 & comment d. Federal courts have consistently held that agreements to arbitrate are, as a matter of law, not unconscionable. *See, e.g., Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d at 286 (rejecting conclusion of California state courts that doctrine of unconscionability applies to standard securities arbitration contracts); *Pierson v. Dean Witter Reynolds, Inc.*, 742 F.2d 334, 339

(7th Cir.1984) (rejecting unconscionability claim in absence of showing that arbitration clause is commercially unreasonable or that plaintiffs lacked reasonable opportunity to understand it); *Surman v. Merrill Lynch, Pierce, Fenner & Smith*, 733 F.2d 59, 61 n. 2 (8th Cir.1984) (rejecting contention that standard brokerage agreement arbitration clauses are unconscionable); *Hurlbut v. Gantshar*, 674 F.Supp. 385, 392 (D.Mass.1987) (holding that agreement to arbitrate securities brokerage disputes before independent, though industry-related, panel of arbitrators pursuant to standard form contract is not unconscionable).

**12.** And even in those circumstances, statutory state law must not interfere with the broader federal scheme. Thus, under the federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, for example, inconsistent state disclosure requirements are preempted by the federal statute. *See, e.g., Truth in Lending: Determinations of Effect on Mississippi, New Jersey, Oklahoma, and South Carolina State Laws*, 48 Fed.Reg. 43,672 (1983); *Mason v. General Finance Corp. of Va.*, 542 F.2d 1226 (4th Cir.1976); *Trustees Loan & Discount Co. v. Carswell*, 435 So.2d 114 (Ala.Civ.App.1983); *Public Finance Corp. v. Riddle*, 83 Ill.App.3d 417, 38 Ill.Dec. 712, 403 N.E.2d 1316 (1980).

## –B–

But analysis does not stop with the Arbitration Act alone. As the Supreme Court observed in *McMahon:*

> Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.

107 S.Ct. at 2337.

Defendants suggest that the role of state Blue Sky law in securities regulation as expressed in the various savings clauses of the federal securities statutes [13] provides that contrary command. This argument finds no support in the case law.

The Seventh Circuit in *Kroog v. Mait,* 712 F.2d 1148 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984), rejected the proposition that general savings language which permits concurrent state and federal regulation of the securities business could sustain a special treatment of arbitration agreements under Wisconsin Blue Sky law. In *Kroog,* the court declined to indulge a Wisconsin effort to import special arbitration regulation under cover of Blue Sky law. The court found that there was no conflict between Congressional protection of state securities regulation through the savings clauses and the federal law of arbitrability maintained under the Federal Arbitration Act:

> [T]he conflict we face is plainly not one of federal arbitration procedures versus Wisconsin substantive securities regulation. The conflict is rather between two *procedural* demands—one that commands, and the other that prohibits, the arbitration of brokerage contract claims. If the Arbitration Act prevails, Wisconsin substantive securities law remains intact,

and would indeed have to be considered by the arbitrator of the dispute here. *Id.* at 1153 (emphasis in original).

Needless to say, the Federal Arbitration Act prevailed in *Kroog.* Thus, even giving full scope to the appropriate role of state Blue Sky law, the savings provisions of the various federal securities statutes do not provide a "contrary Congressional command" permitting state Blue Sky regulators to establish special conditions applicable to arbitration contracts in derogation of the directions of the Federal Arbitration Act. *Cf. Osterneck v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 841 F.2d 508, 512 (3d Cir.1988) (holding preempted § 507 of the Pennsylvania Securities Act when applied to preclude arbitration that falls within the FAA because "[t]he overwhelming weight of precedent militates against ... finding that Congress intended to exempt state securities claims from the general command of the [FAA]").

The defendants point to the treatment given arbitrability by the District of Columbia Blue Sky provisions as authority for the Massachusetts arbitration regulations. *See Levin v. Dean Witter Reynolds, Inc.,* 3 Blue Sky L.Rep. (CCH) ¶ 71,812 (D.D.C. 1983). But *Levin* rested on a Congressional enactment concerned with the District of Columbia as a federal enclave. This provided Congressional authorization for the District's Blue Sky regulation separate from the savings clauses. Thus, the question in *Levin* was not whether a state legislature could create a *Wilko*-type exception to § 2 of the Arbitration Act, but rather whether Congress, in enacting the District of Columbia Blue Sky provisions, had done so. *Cf. Southland Corp. v. Keating,* 465 U.S. at 16 n. 11, 104 S.Ct. at 861 n. 11. At issue in *Levin* was a specific Congressional anti-waiver provision of the type the Supreme Court had found sufficient to override the Arbitration Act in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). Massachusetts Blue Sky law, however, is not supported by such an independent Congressional enactment.[14]

---

**13.** *See, e.g.,* 15 U.S.C. § 77r (1933 Act); 15 U.S.C. § 78bb(a) (1934 Act); 15 U.S.C. § 80b–18a (Investment Advisers Act of 1940).

**14.** For the same reason, the authority granted by Congress to the Commodities Futures Trading Commission to regulate pre-dispute arbitration agreements involving commodities futures,

Moreover, taking a broader view of the authority of securities regulators to address arbitration agreements, it is uncertain whether *Wilko* itself remains authoritative even on its limited facts. *See supra* note 1. It is clear that the Supreme Court has had second thoughts about the role of anti-waiver provisions of the type used in *Wilko* and *Levin* to override the Federal Arbitration Act.

In part, the careful restriction of *Wilko* to its specific facts, *see Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), and the pending reconsideration of the narrowed holding itself, *see Rodriguez de Quijas v. Shearson/Lehman Bros., Inc.*, 845 F.2d 1296 (5th Cir.), *cert. granted*, —— U.S. ——, 109 S.Ct. 389, 102 L.Ed.2d 379 (1988), appear to be premised on supervening Congressional action regarding the arbitrability of securities law claims. As the Supreme Court noted in *McMahon*, "[s]ince the 1975 amendments to § 19 of the Exchange Act [15 U.S.C. § 78s, the United States Securities and Exchange] Commission has had expansive power to ensure the adequacy of the arbitration procedures employed by [the national securities exchanges and registered securities associations]." 107 S.Ct. at 2341. The Commission is now treading gingerly in this area and is encouraging rulemaking by the af-fected self-regulatory organizations. *See supra* note 3.[15] Especially given what the Ninth Circuit recently observed is the "virtually plenary authority [of the SEC] over the arbitration procedures adopted by the national securities exchanges and securities associations," *Cohen v. Wedbush, Noble, Cooke, Inc*, 841 F.2d at 286, there is nothing in the pattern of Congressional enactments regarding securities regulation which can fairly be read to contemplate a peculiar Massachusetts role in the regulation of written arbitration agreements concerning the purchase and sale of securities in interstate commerce.[16]

–IV–

The defendants seek to avoid definitive resolution of this action before the January 1, 1989 effective date for the arbitration regulations. They do so by interposing a motion under Fed.R.Civ.P. 56(f) requesting further discovery before the plaintiffs' summary judgment motion is resolved.

To be sure, the First Circuit has been careful to note that in looking to the effect the allegedly preemptive state action "will have on the federal scheme set up by Congress," courts must require that "[t]he harm of the state law on the federal scheme ... be actual, not potential."

*see* 17 C.F.R. pt. 180; *see generally Ingbar v. Drexel Burnham Lambert Inc.*, 683 F.2d 603 (1st Cir.1982), is inapposite. Nothing in that separate authority suggests that Congress has empowered Massachusetts to create similar regulations to govern pre-dispute arbitration agreements for securities disputes.

**15.** Recognizing the limited vitality of *Wilko v. Swan* after *McMahon*, the SEC itself has actually withdrawn the mandatory disclosure regulations it had earlier required in connection with securities arbitration agreements. Barely three months after the Supreme Court handed down *McMahon*, the Commission reversed its previous rulemaking proceeding, *see Recourse to the Courts Notwithstanding Arbitration Clauses in Broker–Dealer Customer Agreements*, 48 Fed. Reg. 53,404 (1983), and determined that a regulation requiring disclosure of the inapplicability of arbitration agreements to federal securities law claims, 17 C.F.R. § 240.15c2–2, was "no longer appropriate or accurate and, accordingly, should be rescinded." *Rescission of Rule Governing Use of Predispute Arbitration Clauses in Broker–Dealer Customer Agreements*, [1987

Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 84,163 (Oct. 15, 1987).

**16.** The SEC declined an invitation I extended to file an amicus brief in this case on grounds that "the underlying preemption claim is based on the Federal Arbitration Act, not the federal securities laws." Letter of SEC General Counsel Daniel L. Goelzer to the Court (Nov. 14, 1988). The stated reason appears less than candid in light of the defendants' reliance on federal securities law for its opposition to the motion for summary judgment. I recognize, however, that various prudential and strategic considerations, including an interest in permitting the case law to ripen and a desire not to become committed even indirectly on an issue as yet unresolved within the agency, may govern the decision whether to file an amicus brief. *Cf.* P. Irons, *The New Deal Lawyers* 4–5 (1982). I draw no inferences one way or the other from the lack of a formal expression of the SEC's position on the issues presented to me by this case.

*Palmer v. Liggett Group,* 825 F.2d at 626 & n. 11.

But nothing in *Palmer,* or the line of cases it represents, provides justification for delay in entering summary judgment for the defendants. The grounds for preemption are as apparent here as they were in *Palmer.* The actual harm inflicted on the federal scheme for arbitration by the Massachusetts securities arbitration regulations is manifest in the conditions they impose on the validity and enforceability of securities dispute arbitration agreements, conditions not generally applicable to contracts in the Commonwealth. No further factual development is necessary to deal with the legal consequences of that circumstance.

In pressing this motion, the defendants have adopted seemingly inconsistent official positions. After conducting what they presumably consider sufficient proceedings to have a rational basis for promulgating the Massachusetts securities arbitration rules, the defendants now pose as incapable of demonstrating facts sufficient to defeat the plaintiffs' motion because the effect of the regulations is alleged by them to be in dispute. Given this purported inability to join issue with plaintiffs' motion, the defendants contend that no further action on their regulations—now that they have put them in place—should be taken until additional inquiry—which the defendants themselves did not feel obliged to undertake before promulgating the regulations—has been completed.

The defendants' position is laid out in a highly artificial manner. As a matter of semantics, they contend that the regulations are not addressed to the validity or enforceability of arbitration contracts. This contention can be maintained only by assuming that no provision of state law other than one directly governing contract validity or enforceability comes within the preemptive reach of the Arbitration Act. But, as *Palmer* suggests, indirect regulation through a system of sanctions can be every bit as "potent [a] method of governing conduct and controlling policy" as direct proscriptions regarding arbitration.

*Cf. id.* at 627–28 (quoting *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959)). Justice Holmes, while sitting on the Massachusetts Supreme Judicial Court, described the system of sanctions as the essence of the law. "If you want to know the law and nothing else, you must look at it as a bad man, who cares only for the material consequences which such knowledge enables him to predict...." O.W. Holmes, *The Path of the Law,* in *Collected Legal Papers* 167, 171 (1920).

The material consequences are plain here. Should a securities broker attempt to deal with arbitration agreements in Massachusetts after January 1, 1989, in the manner applicable to Massachusetts contracts generally, she will find herself labelled "dishonest" and "unethical" and have her license to do business put in jeopardy. Indeed, as noted above, a contract in violation of the Massachusetts securities arbitration regulations is, as a matter of Massachusetts Blue Sky law, unenforceable. Mass.Gen.L. ch. 110A, § 410(f). Massachusetts could not have been clearer in its intention—despite its oblique means of execution—to make securities arbitration contracts subject to different rules regarding validity and enforceability from those that govern other contracts. It takes no further factual development to reach that conclusion.

The specific additional discovery defendants seek does not appear to address any genuine issues of material fact. The defendant Guthary in his Third Affidavit submitted in support of the defendants' Rule 56(f) motion seeks to develop additional information on "the marginal impact of the arbitration regulations on individualization [of customer accounts]," ¶ 4; whether "a two-tiered commission scheme" to reflect different costs of pre-dispute and non-pre-dispute arbitration contracts "could be implemented in ordinary compliance and training materials," ¶ 5; "the degree to which negotiation over arbitration clauses currently impairs broker-customer relationships," ¶ 6; "how often securities customers who do not sign arbitration agreements currently choose arbitration over litigation

in the absence of a pre-dispute agreement," ¶ 8; and "the application of plaintiffs' commodities experience to securities" and "how many commodities customers arbitrate even in the absence of a pre-dispute arbitration agreement," ¶ 9.

None of these areas of inquiry—even if likely to produce some genuine dispute, a matter defendants do not address—concerns any issues material to my determination. Thus defendants' motion pursuant to Rule 56(f) will be denied. *See generally Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 988–89 (1st Cir.1988); *Taylor v. Gallagher*, 737 F.2d 134, 137 (1st Cir.1984).

–V–

■ Although I am prepared to grant plaintiffs' motion for summary judgment in this matter as a predicate to entry of the dispositive order, an excess of caution prompts me to offer in the alternative reasons for entering an interim order of preliminary injunction invalidating the Massachusetts securities arbitration regulations, should entry of summary judgment be ruled premature because of the denial of defendants' Rule 56(f) motion.

In response to my scheduling conference observation that denial of the motion for summary judgment would not constitute a final order permitting appeal, plaintiffs filed a motion for a preliminary injunction in order to have a serviceable back-up vehicle for immediate appeal. If called upon to rule in this matter only on an interim basis, I would grant such a motion, as plainly satisfying the traditional four-pronged inquiry necessary to support a summary judgment determination in the First Circuit. *See generally Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981).

A. Success on the Merits

My treatment of the motion for summary judgment makes clear my views regarding the plaintiffs' all but certain success on the merits. To the degree that additional positive findings of an adverse effect on arbitration are necessary, the materials presented by the plaintiffs in support of their summary judgment motion supply such additional evidence.

The experience of certain of the plaintiffs with commodities accounts, for which pre-dispute arbitration agreements are subject to special disclosure rules and may not be made a condition of doing business, indicates that a significant number of commodity account customers decline to enter into such agreements. In the experience of plaintiff Shearson Lehman Hutton, 34 percent fewer commodities customers execute predispute arbitration agreements than do securities customers. Affidavit of Theodore A. Krebsbach ¶ 9. A random survey by plaintiff PaineWebber found that 58 percent of commodities account customers refuse arbitration under the non-mandatory scheme. Affidavit of John A. Borgese ¶ 3.

To the degree that the Massachusetts securities arbitration regulations are modelled on the CFTC arbitration regulations, 17 C.F.R. pt. 180,[17] the affidavits submitted in support of a preliminary injunction demonstrate that the special Massachusetts securities arbitration contract rules will have a limiting effect on the formation of arbitration agreements.

B. Harm to Plaintiffs

The harm to the plaintiffs is irreparable if enforcement of the regulations is not enjoined. The patterns and practices of contract formation regarding securities arbitration will, of course, need costly revision during the pendency of the litigation in the absence of an injunction. More significantly, the evidence demonstrates that the costs of dispute resolution itself will increase in direct proportion to the number of claims in which arbitration is rejected. These are costs which cannot be recovered from the defendant state officials. *Cf. Na-*

---

**17.** It should be noted that the CFTC regulations are significantly more precise than the Massachusetts rules. The required disclosure is set forth in the CFTC regulations expressly. 17 C.F.R. § 180.3(b)(4)–(6). And rather than requiring negotiability, the CFTC regulations do not permit a pre-dispute arbitration agreement to be a condition of opening a commodities account. 17 C.F.R. § 180.3(b)(1).

*tional Tank Truck Carriers, Inc. v. Burke,* 608 F.2d 819, 824 (1st Cir.1979).

Moreover, they are substantial costs. A report prepared by Deloitte Haskins & Sells for the New York Stock Exchange indicates that on average the legal costs to brokerage firms from arbitration are $12,000 less than the legal costs for litigation in court. Affidavit of Paul J. Dubow ¶ 11. In the aggregate, while the extent of the plaintiffs' monetary loss is difficult if not impossible to calculate with any precision, it appears reasonable to assume that imposition of the Massachusetts securities arbitration regulations will add between one-quarter to one-half million dollars annually to the legal fees of certain of the plaintiffs.

### C. Harm to Defendants

The harm to the defendants if their regulations are suspended before this litigation reaches conclusion is modest and highly speculative at best. The defendants are in the peculiar posture of defending a set of regulations the effect of which they contend (by their Fed.R.Civ.P. 56(f) submissions) they are not now in a position to describe by admissible evidence. If additional evidence is necessary to demonstrate the interference of these regulations with the Federal Arbitration Act—a proposition I do not accept but which the defendants forward—then a further period of time during which the impact of the singular Massachusetts securities arbitration regulations is studied and analyzed through discovery and full trial would cause little harm. That is the general approach taken by the Securities and Exchange Commission, *see supra* note 3, the federal agency the courts recognize as having virtual plenary power to govern the arbitration contracts of brokers, *see Cohen v. Wedbush, Noble, Cooke, Inc.,* 841 F.2d at 286.

The reasons adduced by the plaintiffs for special securities arbitration rules do not demonstrate that there will be any significant harm if the rules are held in suspension pending a definitive determination of the merits of this case. The suggestion that litigation over the unconscionability of mandatory pre-dispute arbitration agreements will be reduced is hardly persuasive.

The law that such agreements are not unconscionable *per se* is so consistent that a contention that they are should not require any court to linger long over the issue in any event.

To be sure, disclosure as a general proposition is difficult to fault. Certainly, full and fair disclosure is the *zeitgeist* of securities regulation. A case can be made that the fuller the disclosure the better. But the defendants have not undertaken to describe with particularity what precise disclosure is necessary. Unlike the CFTC disclosure requirements, *see supra* note 17, the Massachusetts securities arbitration regulations give no direction about what full disclosure of the "legal effects" of pre-dispute arbitration agreements will entail. The disclosure concerns of the defendants have not been crystallized. In the unformed state in which they are presented by the Massachusetts securities arbitration regulations, these generalized concerns for disclosure do not lend immediacy to the speculative claim of harm to the defendants if interim injunctive relief is granted.

The defendants' interest in "negotiability" is no more compelling as a basis for finding injunctive harm. The defendants speak broadly of unidentified benefits and inducements that brokers will be encouraged to offer to secure pre-dispute arbitration agreements with customers. To the degree these benefits and inducements are specified, however, they seem to center around commission rates. This potential impact on commission rates involves a secondary effect of the Massachusetts securities arbitration regulations which, far from suggesting harm to the defendants, raises troubling questions about the anticipated regulatory scope of defendants' treatment of arbitration by brokers and their customers.

The defendant Guthary, while professing to believe that the effect of his regulations on the plaintiffs' business as evidenced in plaintiffs' affidavits is "speculative, without substantive factual support," offers his own "opinion [that] it would be practical for brokers to adopt a two-tiered commission scheme" to compensate for the cost

differential between arbitrable customer accounts and those which are not. Third Affidavit of Barry C. Guthary ¶¶ 2, 5. This reference to the influence the Massachusetts securities arbitration regulations will have on commission rate structure suggests insinuation by local Blue Sky authorities into brokerage commission rate making, an area in which the SEC exercises full authority. *See generally* 17 C.F.R. § 240.19b–3; Adoption of Securities Exchange Act Rule 19b–3, Exchange Act Release No. 11,203, [1974–75 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,067, at 84,955–57 (Jan. 23, 1975).

Moreover, it is by no means clear that such a two-tiered rate structure will be of economic benefit to customers. To the degree that arbitration constitutes a more economical form of dispute resolution, it may be anticipated that regulations which discourage arbitration will have the effect of raising commission rates—at least on non-arbitration contracts—to absorb the costs.[18] It is difficult to conceive what harm there will be to defendants if an interim injunction prevents (at least until completion of this litigation) institution of the "two-tier commission scheme" contemplated by defendants.

### D. Public Interest

With respect to the question of the public interest, the Congress and the Supreme Court have offered the definitive word. In enforcing the "emphatic federal policy in favor of arbitral dispute resolution" implemented by the Federal Arbitration Act, *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. at 631, 105 S.Ct. at 3356–57, the Supreme Court described the benefits of arbitration favorably in the antitrust context:

> [A]daptability and access to expertise are hallmarks of arbitration. The anticipated subject matter of the dispute may be taken into account when the arbitrators are appointed, and arbitral rules typically provide for the participation of experts

either employed by the parties or appointed by the tribunal. Moreover, it is often a judgment that streamlined proceedings and expeditious results will best serve their needs that causes parties to agree to arbitrate their disputes; it is typically a desire to keep the effort and expense required to resolve a dispute within manageable bounds that prompts them mutually to forgo access to judicial remedies.

*Id.* at 633, 105 S.Ct. at 3357 (footnote omitted).

This is a form of dispute resolution Congress intended to facilitate in the securities context as well, where the Supreme Court has recently held that "agreements to arbitrate Exchange Act claims [are] 'enforce[able] ... in accord with the explicit provisions of the Arbitration Act'." *McMahon*, 107 S.Ct. at 2343 (quoting *Scherk v. Alberto–Culver Co.*, 417 U.S. at 520, 94 S.Ct. at 2457).

The evidence adduced in plaintiffs' affidavits in support of a preliminary injunction tends to show that arbitration is a benefit both to public customers and to brokers like plaintiffs. Customer legal expenses are likely to mirror broker legal expenses; the finding of the Deloitte Haskins & Sells study that broker-dealer legal expenses are significantly less in arbitration than in court litigation may accordingly also be interpreted as predicting relative economic benefit favoring arbitration for the customer.

The Deloitte study shows that customers receive on average a significantly higher percentage of their original claims by pursuing their disputes in arbitration (19.57 percent of claim recovered) than in court litigation (2.60 percent of claim recovered). Affidavit of Paul J. Dubow ¶ 11. The plaintiff Dean Witter reports an even more favorable recovery for customer claimants who pursued arbitration in cases completed in 1987; for those Dean Witter claimants, arbitration yielded 37 percent of total com-

---

18. Of course, to the degree that individual brokerage firms perceive a demand for non-arbitration customer agreements, it may also be assumed that such agreements will be offered— and priced accordingly—by some brokers irrespective of whether state regulations encourage such agreements or not.

pensatory damages sought, compared with 17.20 percent of such damages for those pursuing litigation. *Id.* ¶ 12.

In short, on the evidence before me it appears that court litigation affords customers the opportunity to pay more in legal costs to get less in recovery. Moreover, this opportunity will apparently be preserved only after paying for brokerage services at the higher level of the "two-tiered commission scheme" the defendant Guthary opines will be the likely industry response to the Massachusetts securities arbitration regulations.

Finally, it should be noted that shifting securities disputes from arbitration to court litigation will bring these disputes to a federal court system already overburdened by a heavy caseload. It is a rare securities claim which cannot be styled as a federal question under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5. Such a case can be brought in the federal courts without regard to the amount in controversy under 28 U.S.C. § 1337 and 15 U.S.C. § 78aa. It would be ironic—and hardly in furtherance of the public interest in efficient federal courts—if such actions by non-institutional customers were now to come into federal court in greater numbers at precisely the time that Congress has moved to limit smaller claims in federal court litigation by raising to $50,000 the amount in controversy minimum for diversity actions. Judicial Improvements and Access to Justice Act, Pub.L. No. 100–702, § 201, 102 Stat. 4642 (1988) (to be codified at 28 U.S.C. § 1332).

On the evidence before me, I find significant functional benefits to the public generally, and to the structuring of efficient and economic dispute resolution, if the likely limits on securities dispute arbitration proposed through the Massachusetts securities arbitration regulations are deferred pending conclusion of this case on the merits.

### E. Conclusion

Evaluating these four prongs to preliminary injunction analysis *inter se*, I conclude that given the plaintiffs' clear likelihood of ultimate success on the merits of their preemption claim, the prospect of substantial irreparable harm to the plaintiffs if the injunction is not granted—as balanced against the potential for minimal harm to the defendants if the injunction is granted—and the public interest on the part of both customers as a class and the public at large in furthering the emphatic national policy in favor of the efficiencies of arbitral dispute resolution, an interim injunction staying implementation of the Massachusetts securities arbitration regulations until conclusion of this litigation would be appropriate.

### –VI–

I fully recognize the importance of permitting states to experiment with reforms in economic regulation. Federal courts must be reticent about interposing their powers to prevent such experimentation. The principles were stated with plain spoken eloquence by Justice Brandeis:

> To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.

*New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386–87, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).

This reticence has been given expression by the First Circuit in the preemption context. The court has noted that the federal courts have an obligation to control preemption doctrine for two basic reasons rooted in principles of federalism and separation of powers fundamental to our system of government. First, "diffusion of power to the states is said to further democracy," and second, "a finding of no preemption is regarded as preferable because Congress can overrule it by appropriate legislation, while a finding of preemption cannot be changed by the states."

*Agency Rent–A–Car, Inc. v. Connolly*, 686 F.2d 1029, 1038 (1st Cir.1982).

The key, however, is Congress—and here, the agency Congress has selected for supervision of securities arbitration: the United States Securities and Exchange Commission. Where Congress has been heard to have spoken as emphatically as it has been heard by the Supreme Court concerning the broad preemptive intent of the Federal Arbitration Act in the area of securities disputes, any modification of that intent must come from Congress itself. The courts cannot evade the principles established by broadly preemptive legislation in order to permit state experimentation. Until Congress establishes exceptions to the Federal Arbitration Act permitting states to adopt singular legal principles for the formation and execution of arbitration agreements, state law provisions like the Massachusetts securities arbitration regulations cannot stand.

Finding that the Massachusetts securities arbitration regulations disturb too much the Congressionally declared scheme of treating the formation, validity, and enforceability of arbitration contracts in the same manner as contracts generally, I conclude that I must order the Massachusetts securities arbitration regulations displaced by the force of preemption and allow the plaintiffs' motion for summary judgment.

Accordingly, it is hereby ORDERED that a judgment enter

1. declaring that the Massachusetts securities arbitration regulations, Mass.Regs. Code tit. 950, § 12:204(a)(2)(G)1.a.–c. are preempted by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.;* and

2. enjoining the defendants from enforcing the Massachusetts securities arbitration regulations in any manner.