Ann M. PALMER, as Administratrix of the Estate of Joseph C. Palmer, and Ann M. Palmer and Daphne S. Palmer, Plaintiffs, Appellees,

v.

LIGGETT GROUP, INC., and Liggett & Myers Tobacco Co., Inc., Defendants, Appellants.

No. 86–1525.

United States Court of Appeals, First Circuit.

Heard Oct. 9, 1986.

Decided Aug. 25, 1987.

Donald J. Cohn with whom Webster & Sheffield, New York City, Samuel Adams, Joseph J. Leghorn, Warner & Stackpole, Boston, Mass., and James V. Kearney, New York City, were on brief, for appellants.

Paul M. Bator, Chicago, Ill., with whom Kathryn A. Oberly, Washington, D.C., Mayer, Brown & Platt, Chicago, Ill., Marshall Simonds, Goodwin, Procter & Hoar, Boston, Mass., Arnold & Porter, Washington, D.C., Shook, Hardy & Bacon, Kansas City, Mo., and Jones, Day, Reavis & Pogue, Washington, D.C., were on brief, for Philip Morris, Inc., R.J. Reynolds Tobacco Co., The American Tobacco Co., Brown & Williamson Tobacco Corp. and Lorillard, Inc., amici curiae.

Richard P. Campbell, John A.K. Grunert, Timothy Wilton, Campbell and Associates, Professional Corp., Boston, Mass., and William H. Crabtree, Knoxville, Tenn., on brief, for Product Liability Advisory Council, Inc. and Motor Vehicle Manufacturers Ass'n of the U.S., Inc., amicus curiae.

Robert S. Potters with whom Daniel A. Shapiro and Nix & Potters, Boston, Mass., were on brief, for appellees.

Alan B. Morrison with whom Cornish F. Hitchcock, William B. Schultz, Matthew L. Meyers, Washington, D.C., and Scott D. Ballin were on brief, for American Cancer Society, American Heart Association, American Lung Association, American Public Health Association, and Public Citizen, amici curiae.

Before BOWNES, Circuit Judge, BROWN,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge.

This interlocutory appeal presents one highly disputed issue: whether the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1331 *et seq.* (the Act), preempts the Palmers' smoking and health related claims that challenge either the adequacy of the federal warning on cigarette packages or the propriety of Liggett's advertising and promotion of cigarettes. In deference to the congressional declaration that (i) cigarettes be labeled uniformly and (ii) a balance be struck between the priority given to tobacco commerce and to our national health policy, we hold that the Act does preempt the Palmers' state law claims, and reverse the decision of the District Court.

### A Saga of Cigarette Smoking

Because the certified issue. before us is on appeal from a motion to dismiss, we are limited to viewing the facts of the case only as alleged in the pleadings, interrogatory answers, and pre-trial submissions of the parties.

---

* Of the Fifth Circuit, sitting by designation.

Joseph C. Palmer died on August 26, 1980, at the age of 49, allegedly from lung cancer. The Palmers allege that Palmer smoked between three and four packs of Liggett's cigarettes per day until his death.

On August 19, 1983, Ann M. Palmer, individually and as administrator of the estate of her late husband, and her mother-in-law, Daphne S. Palmer, filed this diversity action in the District Court. In their amended complaint, the Palmers contended that liability should be imposed on Liggett because of its failure to warn adequately of the health consequences of cigarette smoking. The Palmers asserted causes of action for common law negligence, breach of warranty, under Mass.Gen.Laws, c. 106, § 2–314 *et seq.*, and violations of the Massachusetts Consumer Protection Act, Mass. Gen.Laws c. 93A. At bottom, the Palmers complained that Liggett negligently gave inadequate warnings about the dangers of cigarette smoking and that this negligence proximately caused Palmer's death.

In response, Liggett filed a motion to dismiss all inadequate warning claims on the ground that they were preempted by the Act. After a thorough review of the record, Judge Mazzone denied Liggett's motion to dismiss. The court concluded that "Congress [could not have] meant, by its silence on the issue of common law claim preemption, to do away with all means of obtaining compensation for those hurt by inadequate cigarette warnings in advertising." *Palmer v. Liggett Group, Inc.*, 633 F.Supp. 1171, 1173 (D.Mass.1986). The District Court also relied heavily on the analysis contained in Judge Sarokin's opinion in the District Court decision of *Cipollone v. Liggett Group, Inc.*, 593 F.Supp. 1146 (D.N.J.1984), since reversed, 789 F.2d 181 (3d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987).

Because Judge Mazzone found the preemption issue to involve "a controlling question of law," 28 U.S.C. § 1292(b), he certified *sua sponte* this issue for interlocutory appeal, which we have accepted. Upon application by Liggett to this court, the proceedings below have been stayed while this limited appeal comes to us.

*The Act*

The District Court, the defendants, and the plaintiffs agree that the issue of the Act's preemptive force controls the disposition of virtually the entire case. If the Labeling Act is found to preempt state law actions, either expressly or impliedly, the Palmers lose. If Congress did not intend for the Act to be so preemptive, Liggett loses the appeal. The line thus drawn, we proceed now to a discussion of how Congress constructed the Labeling Act.

In 1964, the Surgeon General released the now famous "Smoking and Health: Report of the Advisory Committee to the Surgeon General." That initial report was one of the first official, scientifically approved statements linking cigarette smoking to lung cancer, bronchitis, and emphysema. The public response was immediate and vocal; clearly, some form of governmental action was imminent.

In a rush to protect and inform its citizens, several states proposed and adopted mandatory warning labels for cigarette packages to be sold in their individual states.[1] Given the potential maze of conflicting state regulations, Congress stepped in in 1965 to set up a uniform, nationally consistent system of warning labels for cigarettes. Further, it did so with the express intention of striking a balance between its concern for the national health policy of smoking education and its protection of the trade and commerce aspects of the tobacco industry.[2]

After much internal and external debate, with classic confrontations between North and South, rural and urban states, together

---

1. For example, the New York state legislature adopted the following label in June 1965: "WARNING: Excessive Use Is Dangerous To Health." *Laws of New York 1965*, Ch. 470.

2. At the time the Act was originally adopted, tobacco ranked third in agricultural export products, fifth among all cash crops, and supported some 750,000 farming families. *See* 111 *Cong.Rec.* 13,950, 13,898 (1965) (remarks of Sens. Ervin and Bass).

with vigorous lobbying by all forms of interested groups and businesses, the members of Congress negotiated a hard-fought compromise with the passage of the Federal Cigarette Labeling and Advertising Act, Pub.L. No. 89–92, 79 Stat. 282 (1965), codified as amended by the Public Health Cigarette Smoking Act of 1969, Pub.L. No. 91–222, 84 Stat. 87 (1970) at 15 U.S.C. §§ 1331 *et seq.* In 1984, Congress further amended the Act by the Comprehensive Smoking Education Act, Pub.L. No. 98–474, 98 Stat. 2200 (1984).[3]

This case, like so many we are called on to decide, turns on a question of statutory construction and interpretation. It is by definition a frustrating task, for if the law's meaning is truly "plain" enough or its effect clear-cut enough, there is no need for us to pronounce what we discern its meaning or effect to be. In cases such as this one, however, we must marshal support from the ready arsenal of the canons of statutory construction to declare soberly the deconstructed meaning of the *omission* by Congress of a savings clause, "because Congress knew how to provide a savings clause when it wanted to." We are expected to "discover" the true congressional intent of the phrase "No requirement shall be imposed under State law," yet we are limited to contradictory, even self-serving language from the statute's legislative history to discern that intent.

Nevertheless, that is the task assigned to us, and having acknowledged the inherently unsatisfying nature of it, we come now to the actual words of the law. In some ways, the Act is more straightforward in declaring its intent and effect than are many other analogous regulatory schemes. The Act contains three sections that ad-

dress the preemption issue raised here. First is § 1331, the Act's declaration of policy and purpose.

It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—

(1) The public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and

(2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.

15 U.S.C. § 1331.[4]

Second, § 1333 prescribes the exact label of warning to be placed on each package of cigarettes.[5] The language imposing this mandatory warning is as follows:

It shall be unlawful for any person to manufacture, import, or package for sale or distribution within the United States any cigarettes the package of which fails to bear the following statement: "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health." Such statement shall be located in a conspicuous place on every cigarette package and shall appear in conspicuous and legible type in contrast by typography, layout, or color with other printed matter on the package.

---

**3.** The amendments enacted in 1984 took effect after Joseph Palmer's death, and therefore are not relevant in this case.

**4.** Subparagraph (1) of § 1331 was amended in 1984 to read:
  (1) the public may be adequately informed about any adverse health effects of cigarette smoking by inclusion of warning notices on each package of cigarettes and in each advertisement of cigarettes; and ...
15 U.S.C. § 1331(1) (West Supp.1987).

**5.** The very fact that Congress mandated the precise wording required in a label, rather than merely establishing the "minimum requirements" standard often found in labeling acts distinguishes the Act from cases relied upon by the court and the Palmers as persuasive authority. *See, e.g., Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529 (D.C.Cir.) (involving FIFRA minimum labeling standards), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), and discussion *infra* at note 13.

15 U.S.C. § 1333.[6]

Finally, § 1334 sets out the section most relevant to our preemption analysis—the preemption section:

(a) No statement relating to smoking and health, other than the statement required by section 1333 of this title, shall be required on any cigarette package.

(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.

15 U.S.C. § 1334.[7]

The remainder of the Act includes sections that prohibit radio and television advertising (§ 1335), require manufacturers to report cigarette ingredients to the Secretary of the Department of Health and Human Services (§ 1335a), and require the HHS Secretary to report to Congress annually about developments in "the current information in the health consequences of smoking" (§ 1337). Further, § 1337 also requires the Federal Trade Commission to report to Congress regarding its opinions on the effectiveness of cigarette labeling and the impact of advertising and marketing, along with any recommendations the FTC may desire to make. Sections 1338 and 1339 confer jurisdiction on the District Courts to enjoin violations of the Act, and provide for criminal penalties of not more than $10,000.

## The Preeminence of Preemption

Having set out the relevant portions of the Act, we now consider the preemptive force that it brings to bear on the Palmers' state-based tort claim.

The different forms of preemption are usually summarized by neat citations to familiar Supreme Court authority. Although we are somewhat wary that these ready citations list, but do not describe, and catalog, but do not define, any real distinctions among the various types of preemption, we nevertheless offer the following recitation from the Court in *Louisiana Public Service Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986).

The Supremacy Clause of Article VI of the Constitution provides Congress with the power to pre-empt state law. Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), when there is outright or actual conflict between federal and state law, *e.g.*, *Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962), where compliance with both federal and state law is in effect physically impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), where there is implicit in federal law a barrier to state regulation, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), where Congress

---

**6.** When Congress originally enacted the Act in 1965, and when the link to the hazards of smoking was less firmly established, the warning was a more moderate statement: "Caution: Cigarette Smoking May Be Hazardous to Your Health." Pub.L. No. 89–92, § 4, 79 Stat. 282, 283 (1965).

In 1984, Congress extensively revised the labeling requirements that were in force under the 1969 amendments. Although the 1969, not 1984, warnings are controlling in this case, the Palmers have relied upon the most recent amendments as evidence of the inadequacy of the prior warnings. For information purposes, we set them out below:

[1] *SURGEON GENERAL'S WARNING:* Smoking Causes Lung Cancer, Heart Disease, Emphysema, And May Complicate Pregnancy.

[2] *SURGEON GENERAL'S WARNING:* Quitting Smoking Now Greatly Reduces Serious Risks to Your Health.

[3] *SURGEON GENERAL'S WARNING:* Smoking By Pregnant Women May Result in Fetal Injury, Premature Birth, And Low Birth Weight.

[4] *SURGEON GENERAL'S WARNING:* Cigarette Smoke Contains Carbon Monoxide.

15 U.S.C. § 1333(a)(1) (West Supp.1987).

**7.** Section 1334(b) of the original 1965 Act read as follows:

No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

. . . .

The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law.

476 U.S. at ——, 106 S.Ct. at 1898–99, 90 L.Ed.2d at 381–82.

### The District Court Opinion

In its thoughtful and detailed scrutiny of this case, the District Court considered at length the reasoning in the three major opinions rendered to date in these cigarette products liability cases—the two *Cipollone* decisions, 593 F.Supp. 1146 (D.N.J.1984) (Sarokin, J.), *rev'd*, 789 F.2d 181 (3d Cir. 1986) (Hunter, J.), *cert. denied*, —— U.S. ——, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987), and *Roysdon v. R.J. Reynolds Tobacco Co.*, 623 F.Supp. 1189 (E.D.Tenn.1985). The Third Circuit and *Roysdon* courts held that the Act preempted state law tort claims, while the District Court in *Cipollone* held the claims were not preempted.

After reviewing the basic approaches to preemption analysis, the District Court considered and rejected the argument that either express or any of the forms of implied preemption were present in this case. We reverse and hold that the Act impliedly preempts the Palmers' claim.

8. *See, e.g.*, Copyright Act of 1976, 17 U.S.C. § 301(a); Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(a) & (c)(1); Domestic Housing and International Recovery and Financial Stability Act, 12 U.S.C. §§ 1715z–17(d), 1715z–18(e).

9. *See, e.g.*, Copyright Act of 1976, 17 U.S.C. § 301(b); Occupational Safety and Health Act of 1970, 29 U.S.C. § 653(b)(4).

Judge Mazzone first discussed express preemption. Because that type of preemption has been so strictly construed in the past, and because of the strong presumption against preemption, *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576, 595 (1981), it is unnecessary to disturb the court's conclusion that there is no express preemption present. Because we have no hesitation in determining that the Act impliedly preempts (under whatever rubric) the Palmers' claim, we need not overturn the District Court's view that the preemption section of the Act does not *explicitly* enough preempt state-based claims to be "expressly" preemptive.

The parties have focused their express preemption arguments on vigorous debates over the significance of the fact that there is neither a clause explicitly preempting state claims[8] nor a "savings clause" expressly preserving them.[9] Rather than wade into the bog of doublespeaking legislative history to divine congressional intent from words *not* used, we simply acknowledge that the preemption section reads "no requirement ... shall be imposed under State law," not "State-based tort claims are hereby preempted."[10]

■ The opinion next discusses the subtypes of implied preemption. Although the District Court broke down implied preemption into four categories—occupation of the field, conflict, impossibility, and frustration of purpose, we do not find such labels necessarily helpful, and certainly do not deem them determinative in ascertaining preemption. Rather, the gist of preemption is whether Congress (expressly) did or (impliedly) meant to displace state law or state law concepts in enacting the

10. As part of its express preemption discussion, the court held that compensatory damages could not act as extra-statutory "regulation," so as to be expressly preempted. We need not decide whether such damages constitute express or implied preemption. Rather, as we discuss *infra* at 627–28, we simply note here that, contrary to the District Court's conclusion, we do view compensatory damages as potentially regulatory in nature.

federal law. Thus, instead of attempting to fit the Act into some pre-cast mold of "impossibility" or "frustration," we look to the effect the Palmers' suit will[11] have on the federal scheme set up by Congress. If the state law disturbs too much the congressionally declared scheme—whether denominated as "occupying the field" or "actually conflicting with federal law"—it will be displaced through the force of preemption.

In this case, Congress has eased our task of figuring out its intent by including both a statement of purpose and a preemption section. Because the language of the Act is straightforward and unambiguous, we need not resort to legislative history to determine congressional intent. "Reliance on legislative history in divining the intent of Congress is, as has often been observed, a step to be taken cautiously." *See American Tobacco Co. v. Patterson*, 456 U.S. 63, 75, 102 S.Ct. 1534, 1540, 71 L.Ed.2d 748, 759 (1982); *New England Power Co. v. New Hampshire*, 455 U.S. 331, 342, 102 S.Ct. 1096, 1102, 71 L.Ed.2d 188, 197 (1982); *Piper v. Chris-Craft Industries*, 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124, 143 (1977).

In adopting the Act, Congress explicitly announced a two-pronged purpose. It plainly sought to inform the public that "cigarette smoking may be hazardous to health by inclusion of a warning to that effect." The educational purpose, however, was tempered by a consideration that "commerce and the national economy ... [be] protected to the maximum extent consistent with this declared policy." Further, commerce was to be unimpeded by "diverse, nonuniform and confusing cigarette labeling" regulations. 15 U.S.C. § 1331(1) & (2). Stated differently, in drafting the Act, Congress had two policies—health protection (through education) and trade protection—to implement, but only one purpose: to strike a fair, effective balance between these two competing interests. The result is an Act that "represents a carefully drawn balance between the pur-

poses of warning the public of the hazards of cigarette smoking and protecting the interests of national economy." *Cipollone*, 789 F.2d at 187.

■ It is these policies, and more importantly, the balance fixed between them that is our focus. The language of § 1331 even measures the relative weight of the policies: the federal warning should protect commerce "to the maximum extent" consistent with its health policy. Thus, we consider now the effect of the introduction of a state tort claim into this congressionally calibrated system. As discussed earlier, Congress ran a hard-fought, bitterly partisan battle in striking the compromise that became the Act. It is inconceivable that Congress intended to have that carefully wrought balance of national interests superseded by the views of a single state, indeed, perhaps of a single jury in a single state. Contrary to the District Court's view, we therefore hold that a suit for damages on a common law theory of inadequate warning—if the warning given complies with the Act—disrupts excessively the balance of purpose set by Congress, and is thus preempted.

To permit the interposition of state common law actions into a well-defined area of federal regulation would abrogate utterly the established scheme of health protection as tempered by trade protection. The Supremacy Clause of the Constitution, as enforced through the doctrine of preemption, prohibits this.

### The Remaining Contentions

Having held that the Act impliedly preempts the Palmers' suit because it disturbs the federally calibrated balance of national interests, we briefly address other issues discussed by the District Court or raised by the Palmers on appeal.

First, the Palmers argue, and the District Court agreed, that to prohibit such state-based tort suits would effectively—and wrongly—leave plaintiffs like the Palmers

---

11. The harm of the state law on the federal scheme should be actual, not potential. *See Rice v. Norman Williams Co.*, 458 U.S. 654, 659,

102 S.Ct. 3294, 3298, 73 L.Ed.2d 1042, 1049–50 (1982).

without any remedy for their injuries. Relying on Justice White's statement in *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) that, "it is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct," 464 U.S. at 251, 104 S.Ct. at 623, 78 L.Ed.2d at 454, the Palmers argue that allowing the Act to preempt traditional state tort compensation, an area traditionally left to the states for regulation, is an impermissible overreading of the Act.

■ We reject this argument for several reasons. First, cigarette smoking, at least initially, is a voluntary activity. In the cases relied on by the Palmers in which state remedies were not preempted, the victims had little or no choice in their participation in the regulated fields. *See, e.g., Silkwood* (nuclear energy development); *United Construction Workers v. LaBurnum Construction Corp.*, 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954) (employment). Second, the Supreme Court has often left parties without a remedy by finding state common law preempted. *See Chicago & NW Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981) (finding that the Interstate Commerce Act preempts state common law action for damages against a regulated railroad); *Farmers Union v. WDAY*, 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959) (finding that the Federal Communications Act preempts state libel claim against a radio station). There is no constitutional requirement that a federal law cutting off state remedies "either duplicate the recovery at common law or provide a reasonable substitute remedy." *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 88, 98 S.Ct. 2620, 2638, 57 L.Ed.2d 595, 620 (1978).

The Palmers also contend, and the District Court agreed, that "the effect of compensatory awards on defendants' behavior is indirect and not regulatory in nature." We reject this characterization.

The preemption clause of the Act expressly prohibits "state law," not merely "statutory law" from imposing any "requirement or prohibition" different from the Act's warning label. 15 U.S.C. § 1334. If a manufacturer's warning that complies with the Act is found inadequate under a state tort theory, the damages awarded and verdict rendered against it can be viewed as state regulation: the decision effectively compels the manufacturer to alter its warning to conform to different state law requirements as "promulgated" by a jury's findings.

More than that, the practicalities of modern litigation would inevitably involve conflict between the congressionally ordained warning and the common law label argued for by the plaintiffs. A trial court would not merely submit the question of whether the warning was adequate. Evidence pro and con would have to be offered, including specific examples of what sort of warning reasonably was called for, how it was to be given, and the like. Following the close of evidence, the trial court would have to submit the issue to the jury. In a federal court—as is this case—the judge, either under a general charge or one on special interrogatories under F.R.Civ.P. 49(a), would have to submit the question of warning with precision. This would be necessary so that a reviewing court could determine whether or not the warning fixed by the jury conflicted with the statutory warning. This challenge to the federal warning label's sufficiency—and the confusion it would engender—surely contravenes the Act's policy of uniform labeling.

The District Court held that an award of damages "would have only an indirect effect on defendant's labeling and advertising practices." 633 F.Supp. at 1177. The Palmers disingenuously maintain that any monetary damages awarded would not compel a manufacturer to change its label for, after all, "the choice of how to react is left to the manufacturer." This "choice of reaction" seems akin to the free choice of coming up for air after being underwater. Once a jury has found a label inadequate under state law, and the manufacturer liable for damages for negligently employing it, it is unthinkable that any manufacturer

would not immediately take steps to minimize its exposure to continued liability. The most obvious change it can take, of course, is to change its label. Effecting such a change in the manufacturer's behavior and imposing such additional warning requirements is the very action preempted by § 1334 of the Act. Indeed, it arrogates to a single jury the regulatory power explicitly denied to all fifty states' legislative bodies.

Further, the Supreme Court itself has long acknowledged this power.

[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.

*San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775, 784 (1959). Thus, the regulatory effect of the Palmers' claim is direct, and must be preempted by the Act.

In addition, given the substantial differences in subject matter, we dismiss as unpersuasive the analogies made by the Palmers and the District Court to the *Silkwood* case. The District Court evidently believed that *Garmon's* reasoning had been discredited by the Supreme Court's decision in *Silkwood*—even though nothing in *Silkwood* even remotely suggests that *Garmon* has been qualified or overruled, and even though the Court in *Silkwood* stated that federal law will "preempt the recovery of damages based on state law" whenever "imposition of a state standard in a damages action would frustrate the objectives of the federal law." 464 U.S. at 256, 104 S.Ct. at 626, 78 L.Ed.2d at 457–58.

First, the District Court did not even mention the fact that the Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.,* at issue in *Silkwood,* contains no preemption provision whatever. Moreover, while the Atomic Energy Act has been read by the Supreme Court by implication to confer exclusive federal jurisdiction to regulate issues of nuclear safety, the Act also expressly reserves significant authority to the states.[12]

In contrast, the "comprehensive Federal program" established by the Act contains a sweeping preemption provision, and conspicuously fails to provide *any* role for the states in the area of cigarette labeling and advertising. Further, the enactment and legislative history of the Atomic Energy Act, as amended by the Price-Anderson Act, Pub.L. No. 85–256, 71 Stat. 576, make clear Congress' explicit judgment that state common law damage actions for injuries caused by nuclear operations should be permitted to continue. *See Silkwood,* 464 U.S. at 251–56, 104 S.Ct. at 623–25, 78 L.Ed.2d at 454–57. For that reason, it was the starting place in *Silkwood,* and common ground among all the parties (as well as among all the Justices of the Supreme Court), that state common law damage actions were *not* preempted; the only issue was the much more refined question of whether *punitive* damages (as opposed to compensatory damages) were preempted. The Court's 5–4 decision—that punitive damages were not preempted—was based on the unremarkable conclusion that such damages are part and parcel of the "traditional state tort law" that Congress had decided to preserve within the AEA's regulatory scheme. *Id.* at 255, 104 S.Ct. at 625, 78 L.Ed.2d at 457.

*Silkwood* thus took for granted the answer to the issue that is the central controversy here. It therefore sheds no light at all on the fundamental question in this case—whether state common law damage actions based on alleged failure to provide adequate warnings are permissible in the first instance.[13]

---

**12.** *See, e.g.,* 42 U.S.C. § 2018 (AEA does not affect state authority with respect to generation, sale, or transmission of electric power through use of federally-licensed nuclear facilities); 42 U.S.C. § 2021(b) (federal-state agreements authorized so that states may assume regulatory authority over certain nuclear materials); 42 U.S.C. § 2021(k) (section does not affect state authority to regulate activities for purposes other than protection against radiation hazards).

**13.** The only preemption case cited by the District Court was *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529 (D.C.Cir.), *cert. denied,* 469 U.S.

Accordingly, having dismissed the Palmers' arguments against preemption as meritless, and having determined the effects of state tort liability to be seriously disruptive to the congressionally calibrated balance of national interests, we hold the Palmers' state-based claim of inadequate warning to be preempted by the Act. The decision of the District Court must be reversed and remanded for proceedings consistent with this opinion.

REVERSED AND REMANDED.

1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), in which the court of appeals held that Maryland tort claims were not preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.* FIFRA, which applies to some 40,000 different herbicide and pesticide formulations, imposes an entirely different type of regulatory scheme from that established under the Act. *See* 16 Env't Rep. (BNA) 9 (May 3, 1985). Under FIFRA, each manufacturer drafts a warning label for each product for EPA approval. Thus, two manufacturers of the same regulated product may use different labels of their own choosing, provided only that they obtain prior EPA approval. Further, the statute in *Ferebee* permits "states to impose more stringent constraints on the use of EPA-approved pesticides than those imposed by the EPA," indicating that Congress was indifferent to regulation of these products through state tort law. *Ferebee,* 736 F.2d at 1541. In contrast, the Act explicitly (i) applies to cigarettes only; (ii) mandates the precise language of the label; and (iii) prohibits any state from regulating any aspect of cigarette warnings. The analogy to *Ferebee* must fail.