**John RIDEN, et ux., Plaintiffs,**

v.

**ICI AMERICAS, INC., Defendant.**

**No. 89–0903–CV–W–1.**

United States District Court,
W.D. Missouri, W.D.

May 14, 1991.

Max Foust, Kansas City, Mo., for plaintiffs.

James F. Duncan, Kansas City, Mo., for Cooper Animal Health.

## ORDER

WHIPPLE, District Judge.

Before this court is defendant ICI Americas Inc.'s Motion to Dismiss, filed September 28, 1990. Plaintiffs filed their Suggestions in Opposition on October 10, 1990. Defendant filed its Reply Memorandum on October 22, 1990. For the reasons set forth below, defendant's motion to dismiss will be denied.

## I. STATEMENT OF CASE

On August 17, 1989, plaintiffs John and Marilyn Riden ("Riden") filed a petition for damages against defendants ICI Americas, Inc. ("ICIA") and Coopers Animal Health, Inc. ("Coopers") for injuries Mr. Riden suffered after using Havoc, a rat poison manufactured by the defendants.[1] Between October of 1986 and January of 1987, Mr. Riden was employed on a farm in Stoutville, Missouri. As part of his job, Mr. Riden used and distributed Havoc around the farm grounds. The active ingredient in Havoc is a substance called brodifacoum.[2] Mr. Riden contends that as a direct and proximate result of using the brodifacoum-containing rat poison he suffered "severe bleeding from multiple orifices of his body, sores about his hands and legs, the blocking of Vitamin K coagulation system, gastrointestinal bleeding and other physiological damage to his person." First Amended Complaint at Count I ¶ 5.

In support of their petition for damages, the Ridens assert that ICIA is liable for 1) producing a product that is "defective and unreasonably dangerous when put to a rea-

---

1. This case originally was filed in the Circuit Court of Clay County. It was removed by defendants to federal court on September 21, 1989. During the pendency of this motion, the Ridens sought leave to amend their petition. Their request to amend was granted on February 4, 1991.

Although ICIA and Coopers jointly filed the motion to dismiss, ICIA is now the only defendant in the case. In a court order entered October 12, 1990, Coopers was dismissed with prejudice pursuant to a joint stipulation of the parties. Therefore, ICIA will be treated as the sole author of the motion.

2. Brodifacoum is an anticoagulant chemical. In large enough doses, brodifacoum depresses the body's Vitamin K clotting factors and can cause hemorrhaging.

sonably anticipated use" due to its active ingredient brodifacoum (Count I ¶ 3); 2) failing to give users of the product adequate warning of the "severity or nature of the dangerous poison" it contains and failing to warn users that they should not handle the product with bare skin or breathe the dust from the product (Count II ¶ 9); and 3) negligently failing to properly test the product and to properly warn users of the product's dangerous nature (Count III ¶ 12). All of Mrs. Riden's claims are for loss of consortium.

## II. ICIA'S MOTION TO DISMISS

The sole basis for ICIA's Motion to Dismiss—which is based on the Ridens' original petition for damages—is that all of the claims the Ridens assert are preempted by the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* ICIA contends that FIFRA preempts claims based on a failure to warn theory because products registered under FIFRA must bear a label approved by the Environmental Protection Agency ("EPA"), the agency responsible for administering FIFRA.[3] In support, ICIA argues that FIFRA's legislative history and express language infers that Congress intended to preempt any state role in regulating pesticide labeling. Reply Memorandum at 3.

In support of its contention, ICIA primarily relies on the Honorable Judge Bartlett's decision in *Fisher v. Chevron Chemical Co.*, 716 F.Supp. 1283 (W.D.Mo.1989). Suggestions in Support at 4–7. Therein, the court held that state common law remedies are impliedly preempted by FIFRA because they conflict with the Act's objective of fostering national uniformity in pesticide labeling. *Fisher* principally relied on the reasoning in *Fitzgerald v. Mallinckrodt, Inc.*, 681 F.Supp. 404 (E.D.Mich.1987) in reaching its conclusion. *Fitzgerald* was the first case to find that state common law remedies are preempted by FIFRA. The *Fitzgerald* court reached its decision in spite of the contrary position advanced in

*Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1985) (holding that a state jury award is not an obstacle to the purposes of FIFRA because a manufacturer would not be compelled to change its product's label). Instead, the *Fitzgerald* court relied on the reasoning set forth in *Palmer v. Liggett Group, Inc.*, 825 F.2d 620 (1st Cir.1987), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989) (holding that state common law remedies are preempted by the Federal Cigarette Labeling and Advertising Act). The *Palmer* court did not believe, as the *Ferebee* court did, that a manufacturer would not be compelled to alter its label following an adverse jury verdict.

In response, the Ridens argue that the court should not follow the decision of the *Fisher* court because its result improperly relies on the *Palmer* decision. Suggestion in Opposition at 5–7. As noted above, the *Fisher* court relied on the reasoning in *Fitzgerald* which, in turn, relied on the reasoning in *Palmer* for the proposition that tort claims are impliedly preempted by FIFRA. The Ridens contend that contrary to *Fitzgerald*'s reliance on *Palmer*, the First Circuit tacitly approved *Ferebee*'s finding that FIFRA does not preempt state tort claims. The *Palmer* court distinguished the regulatory schemes of the two acts so as to justify its conclusion that the cigarette act preempts tort claims while FIFRA did not.

In reply, ICIA argues that *Ferebee*'s reasoning, which has been referred to as the "choice of reaction" analysis, is not persuasive. Suggestions in Support at 7. Relying on *Fisher*'s evaluation of *Ferebee*, ICIA asserts that *Ferebee*'s analysis weakly seems to justify its result. In actuality, ICIA contends, a jury award will do just what FIFRA expressly prohibits the state legislatures from doing: regulate pesticide labeling and packaging.

---

**3.** Due to changes made by plaintiffs in their First Amended Complaint, ICIA's argument for dismissal will no longer discharge the entire proceeding. Therefore, ICIA's pleading shall be treated as a motion to dismiss Count II and portions of Count III of the First Amended Complaint.

## III. DISCUSSION

### A. *Federal Preemption*

Federal preemption of state law by the Congress finds its authority in the supremacy clause of the United States Constitution, article VI, clause 2. *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 210–11, 6 L.Ed. 23, 73 (1824). The U.S. Constitution provides: "The Constitution[ ] and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land. . . ." The United States Supreme Court has described three instances where a finding of federal preemption is justified:

> . . . [Congress] provide[s] explicitly that particular state laws are pre-empted. Although courts should not lightly infer pre-emption, it may be presumed when the federal legislation is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." In addition to express or implied pre-emption, a state law also is invalid to the extent that it "actually conflicts with a . . . federal statute." Such a conflict will be found when the state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress.' "

*International Paper Co. v. Ouellette,* 479 U.S. 481, 491–92, 107 S.Ct. 805, 811, 93 L.Ed.2d 883, 896 (1987) (citations and footnote omitted).

Any analysis under the supremacy clause begins with the basic presumption that Congress did not intend to displace state law. *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576, 595 (1981). This presumption is heightened where the federal law would have the effect of barring a state from exercising its traditional police powers.[4] In that instance, courts have been advised to "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the *clear* and *manifest* purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1947) (emphasis added).

The critical consideration in any preemption analysis is whether Congress intended that federal law supersede state law. *Louisiana Public Service Comm'n v. F.C.C.,* 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369, 382 (1986). In searching for Congressional intent, courts often have looked to the law's legislative history, as well as its express language. *See, e.g., Kennan v. Dow Chemical Co.,* 717 F.Supp. 799, 804 (M.D.Fla.1989). The burden is on the moving party to prove that Congress intended to preempt state law. *See, e.g., Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443, 457 (1984).

### B. *FIFRA: Its Legislative History and Regulatory Scheme*

#### (1) FIFRA's Legislative History

FIFRA was adopted in 1947 and later underwent substantial revision through the adoption of the Federal Environmental Pesticide Control Act of 1972. FIFRA replaced the Insecticide Act of 1910,[5] the first federal regulatory foray into this area. In its original form, FIFRA's stated purpose was to "regulate the marketing of economic poisons and devices, and for other purposes." The principal provision of the 1947 Act was its requirement that all pesticides, fungicides and rodenticides had to be registered with the U.S. Department of Agriculture[6] before they could be sold into

---

**4.** State common law tort remedies traditionally have been regarded as within "the scope of state superintendence." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 144, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248, 258 (1963).

**5.** Act of April 26, 1910, ch. 191, 36 Stat. 331 (repealed 1947). The Act of 1910 only regulated insecticides and fungicides. The main thrust of the Insecticide Act was to prevent the manufac-

ture, sale, and transportation of insecticides and fungicides that were adulterated and misbranded. S.Rep. No. 838, 92nd Cong., 2d Sess. 7, *reprinted in* 1972 U.S.Code Cong. & Admin. News 3993, 3999.

**6.** The U.S. Department of Agriculture transferred its responsibilities to the EPA in 1970. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 991, 104 S.Ct. 2862, 2867, 81 L.Ed.2d 815, 825 (1984).

interstate commerce. The Act also included provisions pertaining to the labeling of products registered thereunder. House Comm. on Agriculture, H.R.Rep. No. 313, 80th Cong., 1st Sess. 2, *reprinted in* 1947 U.S.Code Cong.Serv. 1200, 1201.

In 1972, FIFRA was amended and its scope of regulation was significantly expanded. The new version of FIFRA strengthened the EPA's enforcement powers, extended federal pesticide regulation to those products moving only into intrastate commerce, and authorized the EPA to refuse to register a pesticide that proved to be an unreasonable risk to man and his environment. S.Rep. No. 838, 92nd Cong. 2d Sess. 1–2, *reprinted in* 1972 U.S.Code Cong. & Admin.News 3993, 3993–94.

Additionally, the 1972 revision adopted a section expressly articulating the states' authority to regulate pesticides. *See* 7 U.S.C. § 136v. As originally drafted, FIFRA was designed to work in harmony with the Uniform State Insecticide, Fungicide, and Rodenticide Act.[7] The legislative history of the 1972 amendment does not shed much light on why Congress added § 136v to the Act except to say: "In dividing the responsibility between the States and the Federal Government for the management of an effective pesticide program, the Committee [on Agriculture] has adopted language which is intended to completely preempt State authority in regard to labeling and packaging." H.R.Rep. No. 511, 92nd Cong., 1st Sess. 16 (1971). Section 136v states in pertinent part:

(a) A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

### (2) FIFRA's Regulatory Scheme

Under its current scheme, FIFRA directs the EPA Administrator to register a pesticide when

(A) its composition is such as to warrant the proposed claims for it;

(B) its labeling and other material require to be submitted comply with the requirements of this subchapter;

(C) it will perform its intended function without unreasonable adverse effects on the environment;[8] and

(D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

7 U.S.C. § 136a(c)(5).

A copy of the pesticide's label is submitted to the EPA as part of the registration statement the applicant submits. 7 U.S.C. § 136a(c)(1)(C). To obtain approval of the label, a manufacturer must comply with the EPA Labeling Requirements for Pesticides and Devices, 40 C.F.R. § 156.10 (1990). The EPA requirements provide in detail what information must appear on a pesticide label. Section 156.10(a) summarizes what information is required: name, brand, or trademark under which the product is sold, name and address of the manufacturer or registrant, net contents, product registration number, manufacturer's number, ingredient statement, warning or precautionary statements, and directions for use of the product.

---

**7.** The House Committee on Agriculture observed:

It is believed that the enactment of this bill [FIFRA] will greatly facilitate the coordination of work in this field among the States and with the Federal Government. It is highly desirable that laws governing economic poisons be as nearly uniform as possible consistent with the need for the protection of the public, so that manufacturers may have Nation-wide distribution with a minimum of conflict between the labeling requirements of the various laws.

H.R.Rep. No. 313, 80th Cong., 1st Sess. 3, *reprinted in* 1947 U.S.Code Cong.Serv. 1200, 1202.

**8.** The phrase "unreasonable adverse effects on the environment" is defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

While the EPA requirements specify what kind of information must appear on a pesticide label, they do not always specify the exact wording which must be used. Where the EPA does not provide the exact wording, the pesticide manufacturer is responsible for submitting draft language for EPA approval. Pursuant to § 156.10(h)(1)(iii) (Statement of practical treatment [first aid]), § 156.10(h)(2)(1)(A)–(B) (Other required warnings and precautionary statements),[9] and § 156.10(i)(1)(i) (Directions for use),[10] manufacturers are directed to draft language which adequately instructs a consumer on how to use the 'product without unnecessary injury to himself or to the environment. A label may be altered or amended after the product has been registered if the EPA determines that "the change will not violate any provision" of the Act. 7 U.S.C. § 136a(f)(1).

The Act provides that it is unlawful to sell a pesticide that is misbranded. 7 U.S.C. § 136j(a)(1)(E). A pesticide is "misbranded" if its label 1) fails to contain the information required by the EPA requirements; 2) does not contain directions for use "which are necessary for effecting the purpose for which the product is intended and if complied with ... are adequate to protect health and the environment" (7 U.S.C. § 136(q)(1)(F)); and 3) does not contain a warning or caution statement "which may be necessary and if complied with ... is adequate to protect health and the environment" (7 U.S.C. § 136(q)(1)(G)).

### C. FIFRA Does Not Expressly Preempt State Tort Claims

■ This court agrees with the majority of federal courts who have considered the issue that state common law remedies are not expressly preempted by FIFRA. *See Papas v. Upjohn Co.*, 926 F.2d 1019, 1024 (11th Cir.1991); *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1542 (D.C.Cir.1984); *Arkansas Platte & Gulf Partnership v. Van Waters & Rogers Inc.*, 748 F.Supp. 1474, 1481 (D.Colo.1990); *Stewart v. Ortho Consumer Products*, 1990 WL 36129 (E.D. La.1990); *Hurt v. Dow Chemical Co.*, 759 F.Supp. 556 (E.D.Mo.1990); *Whitener v. Reilly Industries*, No. 87–5224, slip op. at 4 (S.D.Ill. Oct. 25, 1989); *Fisher v. Chevron Chemical Co.*, 716 F.Supp. 1283, 1286–87 (W.D.Mo.1989); *Cox v. Velsicol Chemical Corp.*, 704 F.Supp. 85, 87 (E.D.Pa.1989); *Roberts v. Dow Chemical Co.*, 702 F.Supp. 195, 197 (N.D.Ill.1988); *Fitzgerald v. Mallinckrodt, Inc.*, 681 F.Supp. 404, 407 (E.D. Mich.1987); *Wilson v. Chevron Chemical Co.*, 1986 WL 14925. *But see Kennan v. Dow Chemical Co.*, 717 F.Supp. 799, 804– 05 (M.D.Fla.1989) (finding that Congress expressly intended to preempt state tort claims). This conclusion is supported by a reading of the Act's preemption clause, which only provides that the states "shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from" those requirements imposed by FIFRA. 7 U.S.C. § 136v(b). No reference is made in § 136v(b) to the preemption of state common law remedies. Although the U.S. Supreme Court previously has held that state common law remedies can be a "potent method of governing conduct and controlling policy," *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775, 784 (1959), Congress' failure to expressly preempt state common law cannot be ignored. Congress has made direct reference to common law in other preemption clauses.[11] Conse-

---

**9.** The section includes "typical" precautionary statement for the four categories of toxicity identified by the EPA. The precautionary statements address oral, inhalation, or dermal toxicity and skin and eye local effects. The requirements provide that these statements "must be modified or expanded to reflect specific hazards."

**10.** This section provides:
Directions for use must be stated in terms which can be easily read and understood by the average person likely to use or to supervise the use of the pesticide. When followed, directions must be adequate to protect the public from fraud and from personal injury and to prevent unreasonable adverse effects on the environment.

**11.** Congress expressly preempted state common law remedies in the Domestic Housing and International Recovery and Financial Stability Act, 12 U.S.C. §§ 1715z–17(a), 1715z–18(e) (preempting "State constitution, statute, court

quently, Congress' silence is inimical to a finding of express preemption. *Fisher,* 716 F.Supp. at 1287. *See also Cipollone v. Liggett Group, Inc.,* 789 F.2d 181, 186 (3d Cir.1986) (observing that the U.S. Supreme Court generally relies on principles of implied preemption to evaluate when Congress makes no reference to state common law in the preemption clause).

### D. *FIFRA Does Not Impliedly Preempt State Tort Claims*

■ This court similarly agrees with *Fisher* that Congress did not intend to impliedly preempt state common law remedies under FIFRA. *Fisher,* 716 F.Supp. at 1287. As the *Fisher* court properly noted, Congress did not reflect an intention to occupy the entire field of pesticide regulation; rather, it expressly recognized the states' continued right to regulate the sale and use of products registered under the Act. 7 U.S.C. § 136v(a). The adoption of § 136v(a), the *Fisher* court concluded, demonstrates that "the scheme created by FIFRA is not 'so pervasive' or the federal interest 'so dominant' as to demonstrate an intent to preempt all state law claims." *But cf. Papas,* 926 F.2d at 1024–25 (holding that the federal government "has occupied the entire field of labeling regulation, leaving no room for the states to supplement federal law, even by means of state common law tort actions.").

### E. *State Common Law Remedies Do Not Conflict With the Purposes of FIFRA*

■ This court respectfully declines to follow the *Fisher* court's conclusion that state common law claims for failure to warn are preempted because they conflict with the purpose of FIFRA. *Fisher,* 716 F.Supp. at 1287–89. By declining to follow *Fisher,* this court does not dispute its characterization of FIFRA's principal purpose: the registration and regulation of pesticides that do not pose an unreasonable risk to man or his environment. In connection with this objective, Congress gave the federal government the sole responsibility for delineating labeling requirements for pesticides. Instead, this court disagrees with *Fisher*'s determination that the *effect* of a state common law remedy is at odds with the purpose of the Act. *Fisher,* as well as other courts who have reached a similar result, have held that the effect of an adverse jury finding (based on a failure to warn claim) would (1) compel a manufacturer to change the label's language and (2) destroy the Act's policy of uniform pesticide labeling. The court will address each point separately.

### (1)

In *Ferebee,* the first case to consider whether state common law actions are preempted by FIFRA, the Court of Appeals for the District of Columbia held that such claims are not impliedly preempted because a manufacturer could comply with both the federal and state (common law) requirements. 736 F.2d at 1542. The court explained that a manufacturer could continue to use the label and, at the same time, pay damages to the tort claimant.[12] *Id. Ferebee*'s reasoning has been relied on by a majority of the courts finding no preemption. *See, e.g., Evenson v. Osmose Wood Preserving, Inc.,* 760 F.Supp. 1345, 1348

decree, common law, rule, or public policy"); Copyright Act of 1976, 17 U.S.C. § 301(b) (preempting rights "under the common law or statutes of any State"); and in the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(a), (c)(1) (preempting "all laws, decisions, rules, regulations, or other State action having the effect of law of any State").

In fairness to the contrary position, Congress could have preserved state common law remedies by including a "savings clause." FIFRA contains a savings clause pertaining to the states' continued authority to regulate the sale or use of pesticides. 7 U.S.C. § 136v(a).

12. The *Ferebee* court based its finding on two additional rationales: 1) compliance with both federal and state law cannot be said to be impossible because the defendant can petition the EPA to allow the label to be more comprehensive; 2) state common law damages would not serve as an obstacle to the accomplishment of FIFRA's purpose. "Such a conflict would exist only if FIFRA were viewed not as a regulatory statute aimed at protecting citizens from the hazards of modern pesticides, but rather as an affirmative subsidization of the pesticide industry that commanded states to accept the use of EPA-approved pesticides." 736 F.2d at 1542–43.

(S.D.Ind.1990); *Stewart*, 1990 WL 36129 (E.D.La.1990); *Whitener*, No. 87–5224, slip op. at 6; *Cox*, 704 F.Supp. at 87; *Roberts*, 702 F.Supp. at 197.

Three years after *Ferebee* was decided, its reasoning met with sharp criticism in *Fitzgerald*. The *Fitzgerald* court did not believe, as *Ferebee* did, that a manufacturer had a legitimate choice with respect to altering a pesticide's label in the wake of an adverse jury verdict. Rather, the *Fitzgerald* court believed that the "choice of reaction" analysis

> "seems akin to the free choice of coming up for air after being underwater. Once a jury has found a label inadequate under state law, and the manufacturer liable for damages for negligently employing it, it is unthinkable that any manufacturer would not immediately take steps to minimize its exposure to continued liability."

681 F.Supp. at 407 (quoting *Palmer v. Liggett Group, Inc.*, 825 F.2d 620, 627–28 (1st Cir.1987), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989)) (emphasis omitted).

In support of its reasoning, *Fitzgerald* primarily relied on *Palmer*. The *Palmer* court was asked to decide whether state common law claims are preempted under the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1331 *et seq.* The court held that the claims are preempted under the cigarette act. In so finding, the *Palmer* court noted its dissatisfaction with the "choice of reaction" analysis used in *Ferebee*. 825 F.2d at 627–28. The *Palmer* court did not, however, question or criticize its application—or the circuit court's finding—in *Ferebee*. To the contrary, *Palmer*

distinguished the courts' findings so as to reconcile their divergent conclusions.[13]

Although *Fitzgerald*'s reliance on *Palmer* has been criticized, a majority of the courts finding preemption have relied on the decision, including *Fisher*. *See, e.g., Hurt*, 759 F.Supp. 556 (E.D.Mo.1990); *Herr v. Carolina Log Bldgs., Inc.*, No. EV 85–262–C, slip op. at 8 (S.D.Ind. Sept. 22, 1989); *Kennan*, 717 F.Supp. at 806; *Watson v. Orkin Exterminating Co.*, No. JFM–88–2427, slip op. at 2, 1988 WL 235673 (D.Md. Nov. 8, 1988). *Fisher*, in response to criticism that the two cases involve vastly different regulatory schemes (i.e. the cigarette act specifically prescribes what language must appear on a label, while FIFRA directs a manufacturer to submit draft language for certain information), concluded that this is a "distinction without significance; both acts expressly prohibit states from regulating any aspect of labeling." 716 F.Supp. at 1289.

This court is not entirely persuaded by *Ferebee*'s "choice of reaction" analysis. However, this court recognizes that a manufacturer is not "compelled" to alter a product label in response to a jury award in the same way that it is "compelled" to comply with a state law or regulation. For instance, where a manufacturer is faced with an isolated jury verdict, it may dismiss the action as an aberration, pay the judgment and choose not to alter the label.

(2)

*Fisher* and other courts also have argued that state common law claims are preempted because they contravene the Act's policy of uniform labeling, as referenced in 7 U.S.C. § 136v(b). This court does not dispute the import of § 136v(b) as it relates to

---

**13.** In a footnote, the *Palmer* court explained:

> FIFRA, which applies to some 40,000 different herbicide and pesticide formulations, imposes an entirely different type of regulatory scheme from that established under the [Cigarette] Act. Under FIFRA, each manufacturer drafts a warning label for each product for EPA approval. Thus, two manufacturers of the same regulated product may use different labels of their own choosing, provided only that they obtain prior EPA approval.... In contrast, the [Cigarette] Act explicitly (i) applies to cigarettes only; (ii) mandates the pre-

cise language of the label; and (iii) prohibits any state from regulating any aspect of cigarette warnings. The analogy to *Ferebee* must fail.

*Palmer*, 825 F.2d at 628–29 n. 13.

It is worth noting that the U.S. Supreme Court recently agreed to consider the question of whether state tort claims (premised on a failure to warn theory) are preempted by the Federal Cigarette Labeling and Advertising Act. *See Cipollone v. Liggett Group Inc.*, 893 F.2d 541 (3rd Cir.), *cert. granted*, —— U.S. ——, 111 S.Ct. 1386, 113 L.Ed.2d 443 (1991).

the states' formal legislative powers. But it does dispute the contention that where a manufacturer is "compelled" to revise a pesticide label, the result actually conflicts with the uniform system of labeling fostered under FIFRA.

Since FIFRA was revised in 1972, a system of labeling has developed that ensures that certain information appears on all pesticide labels. Although broad in scope, the EPA requirements stop short of creating absolute uniformity in pesticide labels. *Cf. Whitener*, No. 87–5224, slip op. at 5 ("these minimum standards are insufficient to demonstrate a Congressional intent to preempt state tort actions"); *Cox*, 704 F.Supp. at 86–87 ("[v]ery likely what Congress intended through FIFRA was to set minimum standards for pesticide labeling"). Unlike the Federal Cigarette Labeling and Advertising Act, which provides verbatim what language must appear on a cigarette label, FIFRA regulations direct a manufacturer to submit draft language pertaining to first aid treatment, precautionary statements, and directions for use. The distinction between the two laws is driven, in large part, by the products they regulate. Unlike the cigarette act, which regulates only one product, FIFRA regulates 50,000 products—the number of products registered under the Act. These pesticides represent 600 distinct active ingredients. U.S. General Accounting Office, Pesticides: EPA's Formidable Task to Assess and Regulate Their Risks 10 (RCED–86–125, 1986). To replicate the cigarette act's labeling scheme, the EPA would have to devise labels corresponding to each of the 600 active ingredients represented. Clearly, this would be an onerous task. It explains why the EPA chose instead to give a pesticide manufacturer some discretion in drafting its labels.

Although the label's language first must be approved by the EPA before it can be used, the requirements nevertheless permit labeling variations even among products containing the same active ingredient. Thus, to argue that a adverse jury award would threaten FIFRA's policy of uniform labeling belies the truth. Under FIFRA's own terms, a manufacturer may obtain permission to amend a label after it has been registered. 7 U.S.C. § 136a(f)(1). The only limitation is that the amendment cannot conflict with any provision of the Act. Were a manufacturer "compelled" to alter a label because it failed to give adequate directions for use, for example, the manufacturer simply would rewrite the language it drafted in the first instance. The effect of doing this would neither add to nor differ from the EPA's current requirements.

One court has argued that a jury determination concerning the adequacy of a label would scuttle "the methods by which FIFRA protects man and the environment because it would inject irrelevant considerations into the EPA's evaluation of a pesticide and its labeling and would second guess the EPA's conclusions." *Papas*, 926 F.2d at 1026 (footnote omitted). But the fact that an individual was injured while using the pesticide calls into question the adequacy of the label, in spite of the EPA's approval.[14] As the *Ferebee* court properly pointed out:

> By encouraging plaintiffs to bring suit for injuries not previously recognized as traceable to pesticides ... a state tort action of the kind under review may aid in the exposure of new dangers associated with pesticides. Successful actions of this sort may lead manufacturers to petition EPA to allow more detailed labelling of their products; alternatively, EPA itself may decide that revised labels are required in light of the new information that has been brought to its attention through common law suits.

736 F.2d at 1541. The EPA is not infallible. Its method for registering pesticides

---

**14.** The Act, itself, sets forth the limits of using "registration" as a defense:

In no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter. As long as no cancellation proceedings are in effect reg-

istration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter.

7 U.S.C. § 136a(f)(2).

is only as good as the data submitted by the registrant in its registration statement. *See, e.g., Cox,* 704 F.Supp. at 87 ("The fact that manufacturers submit their own labels implies a duty to provide a label that gives adequate warnings ... notwithstanding the approval of the EPA."); Ferguson & Gray, 1988 FIFRA Amendments: A Major Step in Pesticide Regulation, 19 Envtl.L.Rep. 10070, 10071 (Feb.1989) ("All pesticides must satisfy applicable requirements for data when they are first registered. The ongoing changes in the data requirements, however, sometimes leave even recently registered products with 'data gaps' after a short time.").

FIFRA's labeling scheme was created to help minimize the risks attendant to pesticide use by seeing to it that all pesticide labels contain certain essential information. The scheme was not created to dissuade manufacturers from revising their labels when new information suggests that further warnings or instructions are needed. To conclude that FIFRA preempts state common law remedies ignores the practical effect of the EPA requirements. Therefore, the court concludes that state common law claims based on a failure to warn theory are not preempted.

## IV. CONCLUSION

For the reasons set forth above, it is

ORDERED that defendant ICIA's Motion to Dismiss is denied.